## UNITED STATES v. ALBANO.

### No. 6908.

Circuit Court of Appeals, Ninth Circuit.

Feb. 20, 1933.

H. E. Ray, U. S. Atty., and Ralph R. Breshears, Sam S. Griffin, and William H. Langroise, Asst. U. S. Attys., all of Boise, Idaho.

J. M. Lampert, B. W. Oppenheim, and J. B. Musser, all of Boise, Idaho, for appellee.

Before WILBUR and SAWTELLE, Circuit Judges.

SAWTELLE, Circuit Judge.

This is an appeal from a judgment of the District Court, based upon the verdict of the jury, which found that the appellee was permanently and totally disabled, from January 10, 1920. The action was on a war risk insurance policy, and the judgment awarded to the appellee the accrued payments of $57.-50 per month, from January 10, 1920, to and including March, 1932, or a total of $8,395.

The question before this court is whether or not the verdict was based upon substantial evidence. If this question is answered in the affirmative, the judgment must be affirmed. On appeal, we are required to view the evidence in the light most favorable to the plaintiff, where, as here, at the close of all the evidence, the defendant made a motion for a directed verdict, which was denied by the court.

At the beginning of the trial, counsel for the appellant stated: "The government will admit the residence; will admit that the plaintiff was drafted on June 26, 1918; that he was honorably discharged on January 10, 1920; that he applied for and was granted a policy for $10,000 war risk term insurance on June 30, 1918; that the premiums were paid on the policy to and including the month of January, 1920; that the policy lapsed on the last of February, 1920."

The appellant contends that the record contains no evidence to the effect that the work performed by the appellee over a period of years was injurious to his health, or that others assisted him in his work, and that therefore, in the absence of such evidence, it logically follows that during such period of time, the appellee was not totally and permanently disabled. We think, however, that this is not necessarily true. It was not absolutely essential that any witness should ex-

press an opinion on this subject, and the evidence was sufficient to enable the jury to form its own conclusions in that regard.

Summarized, the testimony of the appellee is in part as follows:

"My business is that of automotive electrician. I was engaged in the mercantile business at Kilgore, Idaho, at the time I entered the service. When I first came back from the service I was farming at Kilgore, Idaho. I left the farm in 1922. I did not do my own work on the farm because I was not strong enough. I had a gunshot wound in both arms, both bicep[s] muscles. It made my arms weak. They drained and it was impossible to perform any heavy duties. It made my system weak in general. I suffered pain practically all the time. I suffered pain in the arms after a hard day's work. I used to be troubled, and still am, with nightmares. That has been continuous since service. By nightmares I mean that I fought the war over, all the horrible things that happened to me in the army in the lines came back to me, and come back to me yet when I am tired. The nightmares were much worse shortly after the injury than the injury itself, if that is possible. Before storms, thunder showers or any change of temperature, I have an ache in my arms similar to a toothache or rheumatic pain. I received the gunshot wound on October 15, 1918, in the Argonne Forest in France."

At this point the appellee stripped to the waist and exhibited his arms and chest to the jury.

"I was on my knees shooting my gun. The bullet came across this arm through the chest, across the gun stock and into this arm, and out here. Those arms have been operated upon since that, many times. There is a running sore there; the wound drains here and the other is closed. The right one drains toward the shoulder. The other doesn't drain at this time. It did drain in the middle of the wound, which was the last place to heal up. There is no change in the general condition of my body now as to appearance between this time and as it existed in 1918, right after the first operation. A great deal of bone has been removed from the arms. I have the bones with me. They have been in my possession since they were removed. There is one small fragment of bone in the wax paper. It is the last one that came out of there. It was along in July, 1930, that the doctor took this out. [An envelope containing bones from the appellee's arms was identified and admitted in evidence ]

"Between October 15, 1918, and January, 1920, that being the time of my discharge from the army, I had the following hospitalization service: I went to a dressing station and had treatment for lockjaw. I was there 18 or 20 hours waiting for an ambulance. I was then taken to a tent hospital and had an operation. I was there four or five days after this operation, and then taken to N[e]uilly, just outside of Paris. I then entered the American Red Cross Hospital No. 1, where I stayed until just prior to getting out of bed along in the fore part of March [1919]. They then transferred me to a military hospital at the Luxemb[ou]rg Garden in Paris. I stayed there only a short time, about a week. I was then shipped to the hospital at Brest for treatment, and sailed for America in the latter part of March, 1919. Upon landing in America we went to a hospital at Grand Central Palace in New York City. I was there a week and transferred to Fort Douglas, Utah, at Salt Lake City, arriving in April or May, 1919. I remained there until September of that year, and was then transferred to the Letterman General Hospital in San Francisco. At Fort Douglas, Utah, just previous to being taken to the Letterman General Hospital, I had several operations; one major operation at Fort Douglas, [when] the bone was scraped. They removed considerable bone at that time. The wound was opened and packed with gauze. The arm healed and left a small hole. They called it a sinus. The arms were x-rayed some time after that, and small pieces of bone located. They were removed by a second operation; then I was transferred to the Letterman General Hospital. I arrived there in May, 1919, and was discharged January 10, 1920. At Letterman General Hospital I had various fragments of bone removed and a major operation similar to the one in Salt Lake City. The wound was opened up the length of the scar and the bone scraped. I was discharged from there in 1920 with both arms opened. At the time I received the gunshot wound we were on a hill. After being struck I fell over on the ground. I laid there until my buddy helped me up and helped me down to the bottom of a hill to a shack. That was possibly a matter of minutes until I was helped to my feet. I went down to the bottom of the hill and took cover in a shack, until 2 o'clock the following morning. I was wounded at daylight. Stretchers were made from strips taken out of the bunk in the shack, and we were carried back to the dressing station, approximately three miles from the place that I was injured. It was raining continuously. I rolled off the stretch-

er. I fell in the mud. I was gathered up and put on the stretcher and we continued the journey to the dressing station. At that place they gave me emergency dressings on the wound. I would estimate that it was possibly eighteen hours between the time I was injured and the treatment received at the dressing station. I had lost considerable blood. It had run down and dropped off my hands. My hands and my chest were bloody. They stopped the bleeding process in the field hospital when they applied the heavier bandages. They applied a tourniquet on my arms and stopped the bleeding. I did absolutely nothing in the way of caring for myself after the injury. It was some time after I reached Paris, some three weeks or a month before all the blood was removed from my hands and arms. Dr. Thomas Mullen was ward surgeon and operated on me in American Red Cross Hospital No. 1, several times between October, 1918, and March, 1919, to remove fragments of bone. I next saw Captain Mullen in Pocatello, where I renewed my acquaintance with him and discussed the hospital in France. He operated on me at the General Hospital in Pocatello in July, 1925, and removed some bone from my arm. Dr. Groom assisted Dr. Mullen in the operation. Dr. Groom has lanced my arm several times. After my discharge, on January 10, 1920, I remained on a ranch at Kilgore, Idaho, until November, 1922, when I went to Los Angeles and attended an automotive school, until just prior to the first day of May of the following year. I then [went] to Salt Lake City and worked for the Union Pacific Railroad Company for about two weeks. Physicians for the railroad company gave me a physical examination, and I was discharged, about May 20 [1923]. I did not do the work on the farm. I was not able to do it. I could do some of the light chores, such as milking cows, taking care of the chickens. I did not attempt to do ordinary farm work, such as plowing and pitching hay. At the time my arm was draining pretty heavily, and I couldn't. I was suffering pain. I could raise my arms above my head, but that was all. I could not use my arms for lifting or heavy work. I never attempted to handle a plow. We kept a hired man part of the time, and my brother was just across the road. His grown sons used to do the greater part of my work. I acquired the farm by trading my mercantile business, together with the receipts from the sale of a homestead and a little cash that I had. I assumed a mortgage of about $5,000 on the farm. I lost the farm by foreclosure of that mortgage. I put about $5,500

into the farm. I got the money for the trip to Los Angeles from the last crop raised on the farm. After I was discharged from the Union Pacific, I next worked for the Ellerbeck Battery people in Salt Lake City for about six weeks, and quit to enter the L. D. S. hospital. I was ordered there for an operation, and was operated on my right arm. I was in the hospital approximately two weeks. I had an operation to remove some fragments of bone in the right arm and suffered pain. They opened up the old scar tissue and scraped the bone. I should judge they opened five or six inches. I then went to my brother's ranch at Kilgore, and spent considerable time there to recuperate from this operation. I didn't do any work. I left there in September or October, 1923, and went to Blackfoot. I worked there a short time in a sugar factory, during the sugar beet season. I worked at the sugar factory in September, October, November and part of December, 1923. I was taking care of the engines and pumps. I was probably listed as an oiler, possibly as a mechanic. I don't know what my rating would be. After that I did not have any employment before I entered vocational training on February 11, 1924, at Pocatello, with the Idaho Technical Institution. I stayed there until school was out that spring, about June, 1925[4], and then went into training with the Idaho Power Company. I left the latter place in November, 1924, and went to the C. L. Electric Company, where I was an apprentice armature winder. I continued in that work until August, 1930, in this way: it was broken into. There was some time out. In July of 1925 I was operated on and I didn't go back there until December of that year. My vocational training ended in July [September 15], 1925, the time of my operation.

"From July to December, 1925, I did practically nothing. In December I went back to work for the C. L. Electric Company on an arrangement other than the vocational training. I was doing piece work, so much per armature. It was purely up to me how many armatures I turned out. I worked all the time I could work. My arms would get tired. I would get tired all over. I couldn't stay in there. I probably worked along for two or three days without losing time, but the next few days possibly a few hours a day was all I could get in. I might be on the job all the time, but I was doing more resting than working. If I had a few good days' work in succession, my arm usually drained pretty heavily, and I just couldn't keep going. I did not at any time work a period of

thirty working days straight without losing time because of illness or suffering or pain.

"I continued in that employment until August, 1930. I drew $35 a week, with the understanding that I was supposed to turn out that much work. One week I would draw $35 and at the end of two weeks we were supposed to check up the number of pieces I had done and the total amount of money I should receive, and if it did not amount to $70 I didn't receive $35 the second week. I received whatever I actually earned, between twenty and fifty dollars a month average, possibly twenty-five or thirty.

"In August, 1930, I went in business for myself, associated with the C. L. Electric Company. Mr. Lewis put in some merchandise and equipment. I put in some money, I think amounting to between six and seven hundred dollars. I got the bulk of that money from a life insurance policy. I had a little accumulation of money from various sources. I had the money received from the sale of stock and equipment from the ranch. There is approximately fifteen hundred or two thousand dollars' worth of stock in the electric company. It is a partnership arrangement between me and the C. L. Electric Company. I have drawn out very little money, possibly sixty dollars a month. My arrangement with the C. L. Electric Company relative to profits and losses was that I was to draw $140 a month. I was to share in the profits and losses. One man works in the place besides myself. He does all the work that is required of a place of that sort, such as repairing batteries, removing generators from cars, and changing batteries from cars. That is the type of work that I am trained to do. I do not do that work because there is a great deal of it that I can't do. There is not enough work there to keep both of us busy. There is not more than enough work there for one man.

"I have had a great deal of pain, and it has been about the same during the period of years I have been out of the service since I got hurt, without change since the time that I was in the hospital prior to discharge. My arms were about the same at the time I was working for Mr. Ellerbeck in Salt Lake City as at the present time. The hole in the back of my right arm has been there since I was hurt. I have had an opportunity to work if I desired all of the time since I came to Pocatello. I have not worked continuously. I have spent most of my time since I finished vocational training wiring automobile armatures. I cannot work at that continuously without pain and suffering. There are days I cannot continue possible for a full day of eight hours, and then there are days when I cannot work at all. I have had training in other lines of work. I am getting $78.75 a month disability compensation from the government. I can't recall how long I have been getting this amount. I have always drawn compensation. I own half interest in what is left of the Electric Service Company."

In addition to the appellee's testimony, the record contains that of his wife and other lay witnesses, tending to corroborate his statements concerning his physical condition.

Finally, there is the testimony of two physicians, adduced by the appellee. One of these experts, testifying by deposition, stated that, in his opinion, the appellee "at the present time * * * is not able to follow any substantially gainful occupation," and that "as long as the condition exists that I saw * * * his disability is a permanent one. * * *"

The other physician, in answer to a hypothetical question based upon the testimony introduced at the trial, testified as follows: "It is my opinion that he was totally disabled throughout the period of time from January 10, 1920, the date of his discharge, to the present day, and that he has been permanent under that rule throughout that time. It is the best that medical science can foretell that the condition is reasonably certain to remain permanent in the future."

This same physician also stated on the stand: "Based upon my examination and findings, the man is suffering from a chronic poisoning, from a chronic osteomyelitis of the bones of the right humerus. He is suffering from general nervousness, general weakened muscular condition, and general lack of physical strength."

Only one witness was called by the appellant—the former shop foreman of the Ellerbeck Utah Battery Company, of Salt Lake City. This witness testified that the appellee had worked under him for about three months and a half; that the appellee's duties were to burn plates and straps and to finish batteries; that the appellee would lift the batteries from the dolly truck to the burning bench, about three feet high, one battery at a time, each weighing between 42 and 70 pounds; that, during the period of his employment under the witness, the appellee lost a day or a day and a half; that the appellee worked nine hours a day and was paid between $22.50 and $25 a week; that he left the witness' employment voluntarily to get a bet-

ter position; and that, during the period of such employment, the appellee "was in good physical condition," "absolutely had free movement of his arm and was a good workman," and "had no difficulty in lifting the batteries or doing whatever work I required."

It is fair to say that the appellee's testimony was not altogether consistent on cross-examination. It also developed that he made application for and secured a life insurance policy from an old line company in 1927, and that he made reports while taking vocational training to the effect that his physical condition permitted satisfactory progress in his training, and that he was confident of becoming employable in his present employment objective.

These inconsistencies in the appellee's statements and conduct, however, were matters for the jury to determine, and the jury seems to have resolved the question in his favor. La Marche v. United States (C. C. A. 9) 28 F.(2d) 828, 830.

It is also pointed out that one of the medical witnesses who testified at the trial that the appellee was totally and permanently disabled, and had been since he was discharged from the army, was the doctor who examined the appellee for life insurance. Here again we are met with the proposition that the witness' credibility was a matter for the jury. The jurors saw most of the witnesses, heard most of the testimony, and viewed the physical exhibition of the appellee's person; and they were in a better position to pass upon the credibility of the witness than is an appellate court.

The appellant contends that this case comes within the rule announced in the case of United States v. Rice, 47 F.(2d) 749, decided by this court. The evidence in that case, as recited in the opinion, shows that, immediately after his discharge from the army, Rice entered the employ of a railroad company as a common laborer, and continued in that employment for about two months; that he was next employed as a clerk in an army

store for about three months and as a truck driver for about the same period; that he then resumed his work with the railroad company, where he remained for about four years. The opinion in that case states that Rice worked "almost daily" for more than five years, and consequently, of course, he could not claim that he was permanently and totally disabled. It is also to be observed that in the Rice Case the veteran had not adduced proof that "satisfactorily accounted for" six months of the five-year period, by either illness or unemployment, and that it was not shown that Rice had been hospitalized for any part of that time.

In the instant case, there was not a similar situation. If the appellee's witnesses are to be believed—as the jury decided them to be—it is rather remarkable that the appellee was able to do the work that he did.

The appellant further contends that the $150 per month allowed to the appellee for the support of himself and his family during his vocational training period of approximately nineteen months should be included in the appellee's earnings. We do not believe that this is income in the sense used by the appellant. The allowance in question was for the maintenance of the appellee and his family during the time that he was in training, and we think that it has little or no bearing upon this case, one way or the other.

There are several assignments of error relating to the court's refusal to give requested instructions. We have examined these proposed instructions, and we find that there was no error on the part of the court in refusing to give them.

All the questions of law argued in this case have been passed upon from time to time by this and other courts, construing the War Risk Insurance Act (38 Stat. 711 as amended [see 38 USCA § 421 et seq.]), and it would seem unnecessary to say more than that we think that there was sufficient evidence adduced by the appellee to justify submitting the case to the jury.

Judgment affirmed.