## UNITED STATES v. WORSLEY.

### No. 1011.

Circuit Court of Appeals, Tenth Circuit.
Aug. 17, 1934.

John S. Boyden, Asst. U. S. Atty., of Salt Lake City, Utah, and J. Gregory Bruce, Atty., Department of Justice, of Washington, D. C. (Dan B. Shields, U. S. Atty., Edgar C. Jensen, Asst. U. S. Atty., both of Salt Lake City, Utah, Will G. Beardslee, Director, Bureau of War Risk Litigation, of Washington, D. C., and Randolph C. Shaw, Sp. Asst. to the Atty. Gen., on the brief), for the United States.

Joseph G. Jeppson, of Salt Lake City, Utah (Jess Hawley, Oscar W. Worthwine, and Hawley & Worthwine, all of Boise, Idaho, on the brief), for appellee.

Before LEWIS, McDERMOTT, and BRATTON, Circuit Judges.

McDERMOTT, Circuit Judge.

Again we examine a record for the single purpose of ascertaining whether the trial court should have directed a verdict for the government in a suit on a war risk insurance policy. The claim is for total and permanent disability; the critical date, December 31, 1919.

The plaintiff was thirty years old when he enlisted in August, 1918; he had an eighth grade education and was in good health. Just prior to enlistment he had worked five years steadily for an electric railroad company. Shortly after enlistment he contracted a cold in the head, which settled in the ear. After continued futile treatments at the dispensary, he was sent to the hospital where pus was drained from the ear by the use of a lance; and on December 27, 1918, a radical mastoid operation was performed. After this operation he lost his sense of balance and was afflicted with severe head pains. After some months in the hospital, with continual and unchecked drainage, another operation was performed to remove rotted or necrosed bits of bone from the cavity. There was a partial facial paralysis, a continuous roaring in his ears, and acute and numbing pain. Another operation on his nose afforded no relief. After eight months in this hospital, he was transferred to a base hospital at Salt Lake City, and thence to a base hospital at the Presidio near San Francisco. After eleven solid months in three hospitals, without relief, the army gave up the fight and discharged him on a surgeon's certificate of disability, incurred in line of duty, physical condition poor, on November 14, 1919. The ar-

my surgeons officially reported that he was "unable to perform the duties of a soldier either in active or domestic service." Upon discharge, the wound was still open, granulated and discharging pus; the plaintiff took care of the drainage with cotton on the end of a toothpick. His sense of balance was still affected, in that he staggered or fell if he turned, or his eyes turned, from a line straight ahead of him. He was dizzy and nauseated. The roaring in his head increased in the presence of outside commotion, and receded to a sizzle when he was quiet. Upon the trial, nearly fifteen years after his operation, those conditions continue unabated.[1]

Upon discharge from the army he immediately went under the care of a civilian doctor, who performed another operation in June, 1920, cleaning out the remaining cells.

In November, 1924, another doctor, testifying for the government, found suppurating areas in the ear and drainage of pus. That doctor testified: "In Worsley's right ear, as a result of this operation, there was no eardrum, probably two of the ear bones of the middle ear were missing, he had no posterior canal and the mastoid cavity was entirely obliterated. I do not think the semicircular canals had been touched. When I examined him they were not normal in their reaction on that side. He had pus coming from the eustachian tube, which comes out between the nose and the ear. * * * The mastoid is part of the bone surrounding the skull and I would guess that one-sixteenth of an inch of bone lay between the mastoid proper and the brain." Another doctor testified that "There is the most extensive destruction of bone that I

---

[1] Upon the trial, he described his condition thus:

"I had no hearing in the right side at all except a terrible roar. For about three days I could hear my heart hammering in this ear. That seemed to die down or leave me. Then the roar came in and that has been continuous and is now. In the day time, or when I wake up in the morning, it is more in the form of a roar. I can't describe just what a roar might be. It will probably stay just about the same until I get up to any noise. Then my head fills up till it feels like it would burst. If I am around any noise, or if I am going out, say on one of the streets here, my head will fill up with that noise until I cannot hear anything else except a terrible roar.

"At night when I go to bed or quiet down it is similar to throwing a piece of meat or beef steak on to a hot stove. It dies down to a sizzling, as near as I can describe it. It never stops. I can't tell where it occurs. It seems to be just on the inside of this ear, right around in through here. In the right ear, as near as I can tell it is right in where the ear is, or was. I have tried to ignore the roaring and get away from it. If I allow my mind to dwell on that noise at all, it would drive me crazy, I guess, I don't know. I try to keep away from it as much as I can and get my mind off from it and on to other things. I cannot get away from it, but as I say, I try to do the best I can. It makes me very nervous at all times. It is very annoying. Another condition started shortly after my nose was operated on. It seemed like small streams of ice-cold water were trickling down. Some times it is an itching sensation very similar to that of a bee sting. This sensation is on the inside. I never

can do much. I do the best I can to rub my head, but that is all I can do. It is on the right side. I have these sensations nearly all the time. There is a spot here on the right side of my head about the size of a quarter. It would ache and hurt. It may last for a day, or for two or three days. Then I will again get this crawling sensation in my head. I have never been free from some kind of feeling in this side of my head since the operation. My balance is very poor. When I walk straight ahead I usually have to keep my eyes straight ahead of me. If I should turn either one way or the other I would lose my balance. I would sort of waver or stagger. At times I have fallen over. I usually grab on to something to keep from falling down. This might happen any time—just a little move of the head, or if I was to stoop over and stand up, or if I undertook to look up in the air and right my head, I would get these dizzy spells. I usually just stagger. Usually it does not last very long. It is at these particular times that I look out into space and things are swooning or moving. In a short while that will pass off and I don't have that trouble. It has been with me continuously since the operation. I have never gotten over it. It might happen once a day or it might happen a dozen times a day. As nearly as I can describe the feeling it is just a nasty sick feeling. I am always dizzy with it and I have been nauseated from it. I don't particularly remember the sensation I get when I walk in the dark, if I ever walked in the dark. I usually go very slow and feel for something that will give me a bearing to go on with. If I closed my eyes and stood up I would lose my balance and fall."

have ever seen in a mastoid." In 1933, necrosed bone was again removed from the cavity.

The doctors for both sides agree that his condition has resulted in dizziness, loss of balance, deafness in one ear, and a partial facial paralysis. They agree that the condition is a permanent one unless all three canals of equilibrium are entirely destroyed. No doctor suggested the advisability of such an extensive operation; it is probable that the risk of such an operation would be greater than would be justified for the purpose of restoring the sense of balance. The doctors disagree as to whether the disability is total; doctors testifying for plaintiff believe it is; a doctor testifying for the government believes "Mr. Worsley was able to do work not requiring heavy physical labor, sudden stooping or quick turning and the work he could do, of course, would require that he keep his feet on the floor, as it would be unsafe for him to climb ladders or things of that sort." There is also disagreement as to whether the dizziness, the roaring in the ears, and the loss of equilibrium is accompanied by mental confusion; Worsley and his doctors testify it is; doctors for the government did not discover it, or attributed it to neurosis. Such conflicts have been resolved by the verdict of the jury.

As to his work record: The electric railroad company, his former employer, offered him a job upon discharge, but its doctors rejected him as physically unfit. He did nothing but putter around between visits to the doctor until the fall of 1921. From then until 1924 he was given vocational training, at government expense. His dean testified he was an earnest student but on account of his hearing could not participate in class room work, was frequently absent, and often made complaint, apparently well founded, of dizziness and headaches. He was given special examinations because of his inability to take part in class work. In December, 1924, through the intervention of Governor Mabey, he secured a position with the Utah Copper Company. He managed to work with a gang where his disabilities would escape detection, or at such light work as signaling the operator of a crane. His fellow workmen favored him, but his pain and nervousness were such he could not sleep and on April 1, 1925, "I got disgusted and quit." For the next eighteen months, he tried in vain to get work; but prospective employers, observing his facial paralysis and the open wound in his head, would make such inquiry into his health as to cause them to be sympathetic, polite, but firm in their refusal to employ him.

Through friends he secured a job with a motor company in the fall of 1926, grinding pistons, which he held for five months. But his nervousness caused him to ruin too many pistons and he was discharged. He then worked, with reasonable regularity, for two years with the Intermountain Electric Company. The first year he counted stock; he made many mistakes. He would have to sit down so often during the day, to recover from dizziness, that he came to work an hour early, worked during the noon respite, and until ten-thirty at night in a desperate effort to get his day's work done. His fellow employees helped him with his work constantly; one testified that he was a conscientious worker, and made every effort to do his work well. Despite his efforts, the physical inventory taken at the end of the year disclosed, for the first time, so many glaring errors that he was immediately relieved of that work. But instead of discharging a man who was striving so valiantly to do his work well, his kind-hearted employer shifted him to the shipping office, where his work could be supervised, and gave him a ten dollar raise. But he could not hear over the telephone, his mistakes continued, and he was discharged in December, 1928. There were plenty of available jobs in 1929, but no one would hire him. He could not drive a truck. He tried to run a soft-drink emporium but lost $450.00 in the venture, a part of the proceeds of the sale of his home. From April to December, 1931, he solicited orders for suits, making $23.50 in the eight months. Since then he has done nothing. In an application for reinstatement of his policy, made in 1925, he stated, as he doubtless then believed, that he was not totally disabled.

■ There is no merit in this appeal. That plaintiff suffers from a serious physical impairment is conceded. Whether a man of his limited education, physically so impaired, could follow a substantially gainful occupation with reasonable regularity, in the vicinity of his home, is peculiarly a question for jurors drawn from the vicinage. The expert for the government went no further than to say he could do work which did not entail heavy physical labor, sudden stooping, quick turning, and which permitted him to keep his feet on the floor. He could not drive a car without menacing the public. A man of his years and education cannot compete for office work with the younger, more alert, able-bodied, better educated group which is ample

to supply the demand. The jury, drawn from that community, knows better than we whether it is practicable to find work so circumscribed in his home community, and he is not required to tramp to the ends of the earth to search for a position fitting into the narrow compass of his impaired abilities. His persistent but unsuccessful efforts for many years to find a job he could hold is persuasive evidence that none existed. That he stated, in 1925, that he did not consider himself totally disabled, is one of the pertinent facts submitted to the jury for its consideration. It is not conclusive. There was ample evidence to support the finding of total disability.

There is likewise evidence to support the finding of permanence. The fact is undisputed that all the medical science at the army's command tried for eleven straight months, in three hospitals, to alleviate his condition without success. Doctors in civil life likewise tried and failed. The jury had a right to conclude that if the doctors could not remedy a condition in fifteen years, they never can. It is suggested that a removal of the three canals of equilibrium would restore the sense of balance. But no doctor suggested such an operation; the fact that no doctor, in fifteen years' treatment, has suggested it is persuasive evidence that there is some reason why it has not been done. Perhaps no surgeon cares to trifle with human life by undertaking to cut away, with mallet and chisel, three bony canals when the brain is but one-sixteenth of an inch away. If medical science later succeeds in solving this problem which so far has baffled it, appropriate action may then be taken to relieve the government of the monthly payments.

The work record is not sufficient to bar recovery. As in Storey v. United States (C. C. A. 10) 60 F.(2d) 484, the work record here corroborates, rather than contradicts, the claim of total disability. It demonstrates his willingness but inability to work. With great persistence, under most trying circumstances, the plaintiff made every effort to find and hold a job, but was unsuccessful. It is suggested that his vocational training prevents recovery as a matter of law. Not so. It is evidence, to be weighed with other evidence, on the main issue. United States v. Higbee (C. C. A. 10) 72 F.(2d) 773 (decided August 17, 1934); Taylor v. United States (C. C. A. 5) 71 F.(2d) 76; United States v. Nickle (C. C. A. 8) 70 F.(2d) 873; Dukes v. United States (C. C. A. 4) 66 F.(2d) 73; Wilks v. United States (C. C. A. 2) 65 F.(2d) 775; United States v. Tucker (C. C. A. 4) 65 F.(2d) 661; United States v. Albano (C. C. A. 9) 63 F.(2d) 677; Blair v. United States (C. C. A. 8) 47 F.(2d) 109. When plaintiff was given this training, the statute provided that it should be afforded the veteran "who, after his discharge, in the opinion of the board, is unable to carry on a gainful occupation, to resume his former occupation, or to enter upon some other occupation, or having resumed or entered upon such occupation is unable to continue the same successfully." Act of June 27, 1918, 40 Stat. 617. On June 7, 1924, this was amended to read, "who, in the opinion of the director, is in need of vocational rehabilitation to overcome the handicap of such disability." 43 Stat. 627, 38 US CA § 531. The fact that one is afforded training is simply a reflection of the opinion of the Board or Director as to his need therefor. If the training is successful and does rehabilitate the veteran so he is able to resume his place among the workers of the world, then he has, of course, no claim. If, as here, the training does not enable the veteran, after earnest effort, to carry on, certainly the mere fact that an unsuccessful effort to rehabilitate him has been made does not bar recovery.

We are cited to United States v. Barker (C. C. A. 9) 36 F.(2d) 556. Aside from the fact that the veteran there, as here, had a suppurative mastoiditis while in the service, we see no similarity in the cases. There a simple mastoidectomy was performed before discharge; here it was a radical mastoidectomy. There he was regularly employed four months after the operation. Here he was in the hospital eleven months after the operation. There a second operation stopped the suppuration; here repeated operations have left the wound draining fifteen years later. There the insured twice passed physical examinations for employment; here he was rejected. There he held a steady job for three years and quit of his own accord. Here he lost three jobs because he could not do the easiest kind of work. Counsel's attention is directed to the statement of Mr. Justice Butler in Lumbra v. United States, 290 U. S. 551, 54 S. Ct. 272, 275, 78 L. Ed. 492, that "That which sometimes results in total disability may cause slight inconvenience under other conditions."

The plaintiff went into the army a strong young man, with a good job, owning his own home. He came out a physical wreck, partially deaf and paralyzed, his sense of balance gone, with a gaping and running wound

in the head. Fifteen years of relentless but unsuccessful effort to beat his way back has left him broken, physically and financially, hopeless and helpless. He is entitled to recover, and the judgment is affirmed.