## UNITED STATES v. BOWMAN.
### No. 1009.

Circuit Court of Appeals, Tenth Circuit.
Oct. 30, 1934.

Rehearing Denied Nov. 30, 1934.

LEWIS, Circuit Judge, dissenting in part.

Thomas E. Walsh, Atty., Department of Justice, of Washington, D. C., and Edgar C. Jensen, Asst. U. S. Atty., of Salt Lake City, Utah (Dan B. Shields, U. S. Atty., and John S. Boyden, Asst. U. S. Atty., both of Salt Lake City, Utah, on the brief), for the United States.

Oscar W. Worthwine, of Boise, Idaho (Joseph G. Jeppson, of Salt Lake City, Utah, and Jess Hawley, of Boise, Idaho, on the brief), for appellee.

Before LEWIS, McDERMOTT, and BRATTON, Circuit Judges.

LEWIS, Circuit Judge.

Appellee recovered on a $10,000 war risk insurance policy. He enlisted November 2, 1917, and was honorably discharged April 19, 1919. He arrived in France in January, 1918, and was sent to the front in March. After three or four months it became his duty to drive a ration cart delivering supplies to the front. This at times brought him within reach of enemy shell fire. He became very nervous and had pains in his stomach and vomiting. At times he couldn't eat a meal and retain it. He had a burning in his stomach. This weakened him, and he answered sick calls. When it was quiet at the front he was better. At one time he was in bed in a barn for a week.

Immediately after discharge he went to his father's home in Utah. After being there a week he went to his own farm of 65 acres. It was time to put in a crop. He drove four horses to a gang plow with harrows attached for about five days growing more nervous, weaker, and had pains in his stomach. He hired a man to continue plowing. He helped some on the farm throughout the season of

1919, fixed a fence, plowed a ditch, mowed, raked and hauled hay. He ran the derrick for three days, but couldn't continue because of pains, vomiting, and burning in chest. When these came on he would go to the house and lie in the shade. He did part in cultivating the beets. Right after haying season in 1919 he went to Dr. Adamson, now deceased, who gave him powders to take before and after meals and prescribed his diet to consist of soft boiled eggs, cream and cereals. He couldn't eat meat except a little bacon.

In 1924 or 1925 his tonsils were taken out. About a year later his appendix was taken out. In December, 1931, all his teeth were extracted.

Premiums on the policy were paid up to March 31, 1920.

He and his wife had some dairy cows. She did most of the milking. He helped her when he could. In 1924 he hired a boy to assist in the milking, and since that time the boy or a hired man has helped with the cows.

In the spring of 1920 he started to help put in the crops, but soon found that the pains, burnings in his stomach and vomiting came on. It made him weaker. He hired a man to do the work. He drove the team to the wagon at times. He did some mowing of hay and looked after the derrick part of the time in 1920. He went to the field at times with his wife in 1920 and 1921. She would either hold the plow or drive the team, and he would do the other. . He drove the team in hauling sugar beets to the dump in 1920. In 1921 he helped to farm very little. Apparently he was slightly gassed in May, 1918, to which he attributes the burning in his chest. In 1923 he spent $1,500 in building a barn. Since then he has made other improvements that cost approximately $3,000. His farm is irrigated land, and since his discharge he has put every bit of it to use every year, there being three acres in pasture. His pains have increased and his vomiting has become more frequent.

On January 4, 1930, he submitted to a surgical operation known as gastroenterostomy, that is, a new opening was made in the stomach in the bottom portion, also an opening was made in the small intestine, and these two openings were sewed together so that food passes through the new opening instead of through the pylorus. That was done because examination showed that the pylorus was partially obstructed by a cancerous condition which retained the food in the stomach longer than the normal period. Later examinations seem to show that the operation had been a success. It was expected that the result of the operation would remove the cause of vomiting and pain. The only explanation the attending surgeons gave as to why that result did not follow is that his pains and vomiting are now due to his nervous condition.

Appellee testified that he now eats six or seven times a day, taking milk, soft cooked eggs, soft cereals, fruit juices, soft bread and graham crackers; that he vomits after eating each meal, except the one that he takes at midnight in bed, which he began taking after the operation, and with very few exceptions that meal stays down.

In November, 1928, appellee tried selling automobiles as a business and sold cars to all of his brothers and neighbors. He quit selling in the spring of 1929. He would be home of nights. He attributes quitting to a fear that he might vomit when he had a customer. He was away from Utah during the winter of 1927 and 1928. It may be inferred though not specifically stated, that he was then doing missionary work by making calls and holding conversations. He said it was embarrassing because he could not eat a meal with the families he visited, which would render him sick in their homes. Several times while so engaged he was laid up for a day or so with vomiting, pains and burning. He was first counselor to the bishop of his church and does some work among the people. He attends religious meetings when he can.

Appellee has directed the work on his farm, what crops to put in and arranges for selling them after harvesting. He carries a bank account in his own name which reflects receipts from farm and dairy operations. He doesn't sell hay but figures the amount to raise to carry his own stock and puts the remaining land in grain and sugar beets. His wife, whom he married a few months after discharge, had $2,250 which she turned over to him, and it was credited to his account in the bank. She had four cows, and they and their increase were added to the dairy herd.

Appellee's wife testified that she first noticed him vomit about a month after their marriage; that during the first three or four years it occurred once or twice a week; that now it occurs after every meal; that his first work was plowing the beets, and he got so sick he had to, get off the plow and vomit; that sometimes he would milk one cow and have to go to the house; that he did a little light work in 1920; that he couldn't stand

the noise of mowing, he would go to pieces on the mower and come home sick. He hasn't mowed as long as a day since 1920. He would plow part of the forenoon in seeding time and have to quit. Sometimes he would cultivate the beets half a day. His midnight meals stay down as a rule, but not the others. In 1920 he planned the work in putting up the hay. He would at times watch what was being done. At times he would pitch hay for a while. At the planting season he would start to do something and be unable to finish. Since 1919 he has never been able to work a whole day, nor more than one-third of the time including light work. He would start a cultivator, help to regulate it, and the hired man would do the work. He did not work three or four days in a row, except on rare occasions. When he first came home as the years went on he would work three or four days at a time, but not on hard work. It never happened that he worked with a pick and shovel on ditches for four days in a row ten hours a day. The ditch work on his farm is done by him in driving his team occasionally.

It seems clear appellee's pains and vomiting were not frequent for three or four years after his discharge, that his persistence in attempting to do hard labor brought on those attacks, and they have constantly grown more frequent.

The physicians and surgeons who testified for each of the parties were in agreement that appellee had ulcers of the stomach, one for appellee that he still has it. But the court in its instructions said to the jury that inasmuch as the medical men who had testified all agreed that such a disease is curable, it was not permanent in character:

"The ultimate question for your determination in this case is: was the plaintiff on the 31st day of March, 1920, physically able with reasonable continuity to follow a substantially gainful occupation for which he was fitted, without serious danger to his life or health? And concretely the question presented by the evidence in this case is this: Has as a matter of fact the plaintiff been afflicted with these spells of vomiting and weakness as testified to by him and his several witnesses, and if so have such spells of vomiting and weakness rendered it impossible for him to continuously engage in his occupation as a farmer, within the meaning of this rule? * * *

"If these symptoms and conditions arise from stomach ulcer he would not be entitled to recover because the testimony of the doctors is that stomach ulcer is curable. But if it arises from conditions which surrounded him during his service in the army and was occasioned by the stress and exposure which he endured as a soldier in the army by affecting him physically as respects his stomach itself or otherwise as respects his nervous system which sympathetically controlled that organ, and it may be reasonably expected as a result of such exposures and surroundings that it will continue during the balance of his life and it has rendered him totally disabled within the rule, then he would be entitled to recover whether he had ulcer or whether he did not have ulcer."

No exceptions were taken to the court's instructions, and we think they are not subject to criticism insofar as the court went; but we are further of the opinion that an issue of fact vital to the rights of the parties arose on the proof demanding the guidance of the court. It is true that appellant's counsel brings the case here only on the refusal of the court to instruct a verdict in its favor at the close of all the evidence, to which action exception was saved. Nevertheless, we are not precluded from consideration of an omission of the court in failing to declare the law on an issue that goes to the very right of the parties, though not called to the court's attention at the time.

In another case of this kind (United States v. Steadman, 73 F.(2d) 706, opinion filed this day) we had occasion to say:

"Neither expressly nor impliedly is self-inflicted disability covered by the contract sued on, and negligent disregard of one's conduct with knowledge that it may be harmful to him puts him in no better position."

As said supra, the facts in this case seem to bring appellee within that principle. Instead of refraining he persisted in his attempts to do hard labor with knowledge that they would aggravate his ailment, thus rendering them less yielding to treatment and cure. The jury should have been instructed that if they so believed he could not recover.

Physicians and surgeons testified for appellee that in their opinion appellee was totally and permanently disabled on March 31, 1920, and for appellant that he was not. This was the ultimate issue for determination by the jury. It was incompetent testimony. We refer to our discussion of such testimony in the Steadman Case as applicable here. It was in effect leaving to the witness the right to tell the jury how it should decide the case. Miller v. United States (C. C. A.) 71 F.(2d)

361. It was not objected to by either side, but in passing on the motion for an instructed verdict we think it is our duty to disregard such testimony, and in a close case, as here, it was clearly prejudicial.

For the reasons stated, reversed and remanded.

BRATTON, Circuit Judge (specially concurring).

Plaintiff testified as follows:

"The farm I operate at Lewiston is 65 acres. I have had the 65 acres since I got out of the army. The amount I have in hay varies, the most I ever did have in hay at one time was 45 acres, the least I ever had was some 20 odd. It is all under irrigation right now. I have about three acres in pasture land, the rest is cultivated farm land. The most beets I ever had was 18 acres, the least was five. My grain is irrigated grain. The most grain was possibly 15 acres. It was oats and barley. I did not have any wheat. The last grain I had was five or six acres. I had a truck garden for my own use. No fruit trees. I have had as high as thirteen cows. At the time we were married my wife had four cows and I had one. We increased it to thirteen and sometimes it was ten. We had between ten and thirteen all the time.

"Since I got out of the army I have cultivated all of this farm land each year. Since I got out of the army I have put every bit of the farm to use every year with the exception of three acres of pasture. I have always kept that for pasture. So I have really sixty two acres under cultivation less some rights in that. The deeds call for that. I bought the biggest portion of this farm around 1912, I wouldn't be definite as to the date. I gradually added to it by small purchases until I went into the army.

"Since I came out of the army I have purchased one and three-fourths acres. I couldn't tell the year, but it was in the neighborhood of 1924. I could tell that I paid $270.00 for it offhand. I can't tell what I paid for it. I paid for it.

"I did not have a dwelling house on this place when I bought it. I put one on some time after. I had a house there prior to the time I went into the army. In 1923 I built a barn on this farm that cost in the neighborhood of $1500.00. I built a milkhouse, but I don't know when. It cost about $50.00. I built a chicken house in 1928. It cost less than $500.00, something like $300.00, I don't know for sure. The milking machine cost

around $315.00. I have spent about $700.00 since the war in putting in new fences and repairing old ones. In creating land for irrigation purposes I put in about $700.00. The irrigation pump which I installed on the farm cost me a thousand dollars. I installed that pump after I got back from the army. Before I went into the army there were forty five acres that I didn't have water rights to. I bought those after I got out of the army and paid $400.00 for them. * * *

"I bank with the Lewiston State Bank of Lewiston and banked with them before and after the war. All the deposits with the exception of what I got from my wife, which was $2,250.00, are receipts from the operation of this farm. That was deposited in November, 1919."

His deposits in the bank were: 1919, $5,009.08; 1920, $4,141.42; 1921, $1,339.09; 1922, $2,720.36; 1923, $4,015.20; 1924, $4,289.26; 1925, $3,856.83; 1926, $2,647.64; 1927, $2,139.92; 1928, $4,111.30; 1929, $4,296.04; 1930, $3,082.01; 1931, $3,593.25; 1932, $1,499.23; and 1933, $979.35. These undisputed facts reflect a work record which precludes recovery on plaintiff's part. I, therefore, concur in the reversal of the judgment. But in doing so, I do not share the view that the testimony of the doctors was incompetent.

It is settled by recognized principles of law that a doctor may not testify in a case of this kind whether in his opinion the insured is totally and permanently disabled. That is a legal conclusion upon which he may not express an opinion, for it invades the province of the jury. United States v. Bass (C. C. A.) 64 F.(2d) 467. Neither should he be allowed to testify whether a visible disability, such as the loss of an arm, leg, or eye, renders one unable to follow continuously a substantially gainful occupation 'because the jury can determine quite as well as a doctor the degree of disability in such circumstances. The case of Miller v. United States (C. C. A.) 71 F.(2d) 361, falls within that class.

It affirmatively appears from the record that the question propounded to Doctor Hayward included a definition of total and permanent disability. With it in mind, the witness responded that in his opinion insured was so disabled at the material times. The narrative record does not reflect the form of the questions propounded to the other doctors. The competency of the testimony was not raised by the parties in the trial court, nor in this court. That fact doubtless ex-

plains the absence of the questions in verbatim. We should assume in that situation that the questions to the other physicians contained a like definition. Propounded in that form, it was tantamount to asking the witness whether in his opinion the insured was able to follow continuously a substantially gainful occupation. The legal question presented is whether testimony of that kind is competent.

The general rule against a witness properly qualified as an expert expressing an opinion upon the legal question to be decided by the jury does not preclude him from testifying upon the technical issue or point in judgment. One of the leading cases upon that question is United States Smelting Co. v. Parry (C. C. A.) 166 F. 407, 410. There a brick mason recovered damages for personal injuries suffered as the result of a fall from a scaffold used in the construction of a bridge. It was contended that planks protruded beyond the end of the scaffold without being secured; that they were unsafe and caused the accident. A practical brick mason was permitted to testify over objection that a scaffold constructed in that manner was not as safe as those usually used in work of that kind and was very dangerous. After stating the general doctrine against an expert witness expressing an opinion upon the ultimate question for the jury, the court said:

"It is true that in trials by jury it is their province to determine the ultimate facts, and that the general rule is that witnesses are permitted to testify to the primary facts within their knowledge, but not to their opinions. And it is also true that this has at times led to the statement that witnesses may not give their opinions upon the ultimate facts which the jury are to decide, because that would supplant their judgment and usurp their province. But such a statement is not to be taken literally. It but reflects the general rule, which is subject to important qualifications, and never was intended to close any reasonable avenue to the truth in the investigation of questions of fact. Besides, the tendency of modern decisions is not only to give as wide a scope as is reasonably possible to the investigation of such questions, but also to accord to the trial judge a certain discretion in determining what testimony has a tendency to establish the ultimate facts, and to disturb his decision admitting testimony of that character only when it plainly appears that the testimony had no legitimate bearing upon the questions at issue and was calculated to prejudice the minds of the jurors. Holmes v. Goldsmith, 147 U. S. 150, 164, 13 S. Ct. 288, 37 L. Ed. 118; Williamson v. United States, 207 U. S. 425, 451, 28 S. Ct. 163, 52 L. Ed. 278; Alexander v. United States, 138 U. S. 353, 356, 11 S. Ct. 350, 34 L. Ed. 954; Moore v. United States, 150 U. S. 57, 60, 14 S. Ct. 26, 37 L. Ed. 996; Clune v. United States, 159 U. S. 590, 592, 16 S. Ct. 125, 40 L. Ed. 269. And it is in keeping with this modern tendency that it is now generally held, as stated in Chicago Great Western Ry. Co. v. McDonough (C. C. A.) 161 F. 657, 662, and in the cases there cited, that whether or not a witness tendered as an expert is qualified to testify as such rests largely in the discretion of the trial judge, and that his decision thereon ought not to be disturbed, unless it can be said that it was manifestly erroneous.

"The most important qualification of the general rule before stated is that which permits a witness possessed of special training, experience, or observation, in respect of the matter under investigation, to testify to his opinion when it will tend to aid the jury in reaching a correct conclusion; the true test being, not the total dependence of the jury upon such testimony, but their inability to judge for themselves as well as is the witness. A reference to adjudicated cases will show the extent of this qualification, its application in actual practice, and the discretion accorded to the trial judge in that regard."

The court held that the testimony was admissible, and affirmed the judgment. That case, a widely recognized authority, has been followed repeatedly by this court and others. It was cited with approval by this court in New York Life Insurance Co. v. Doerksen, 64 F.(2d) 240, 241, in which this language was employed: "Where the matter under inquiry is one on which certain persons by reason of training, observation, or experience possess expert knowledge which will be of aid to the jury in reaching a correct solution of the issues and is therefore properly the subject of expert testimony, it is no objection that the opinion elicited from the expert is on an issue or point to be decided by the jury."

That doctrine has peculiar application in a case of this kind. The disability here results from the impairment of an internal organ of the body little known or unknown to laymen. The jury of laymen were required to learn the location and function of the organ, the degree of disorder, the extent

of impairment, and whether one thus stricken is totally and permanently disabled. It is doubted whether any one will be heard to say that a doctor may not testify with respect to the nature of the disability, the organ involved, its functions, the degree of its impairment, how it should be treated, whether the sufferer should rest, and whether work would be harmful. If he may express an opinion as to the effect of work, he should be allowed to say whether the patient is able to follow continuously a substantially gainful occupation without injury, because the two are the same thing expressed in different language. There is no substantial difference between them. And, in a case involving disability resulting from impairment of an obscure internal organ, those skilled in medical science are the chief source to which a jury of laymen may turn for helpful information. It is a technical matter concerning which experts are best able to aid the jury. The admissibility of such testimony has been upheld. United States v. Clapp (C. C. A.) 63 F.(2d) 793. This court held that its exclusion constituted reversible error. Runkle v. United States, 42 F.(2d) 804. Its exclusion is to deny the jury access to the most valuable reservoir of aid in resolving the ultimate question presented to them. Of course, such testimony is not conclusive. After bringing to bear upon it the exercise of their own experience and common knowledge, the jury may accept or reject it. Dayton Power & Light Co. v. Public Utilities Commission, 292 U. S. 290, 54 S. Ct. 647, 78 L. Ed. 1267; United States v. Gower (C. C. A.) 50 F.(2d) 370; United States v. Doublehead (C. C. A.) 70 F.(2d) 91.

The testimony was not upon the ultimate question to be resolved by the jury. The ultimate question was whether the insured was totally and permanently disabled. The effect of the testimony was that in the opinion of the experts he was unable to follow continuously a substantially gainful occupation. That is the factual definitive term into which total and permanent disability has been translated. It is one step removed from the ultimate question which the jury must determine. It was strongly suggested in a quite recent case that a witness may be asked whether an insured is totally and permanently disabled if the question contains that definition; it being implied that such a question is tantamount to asking whether the sufferer may follow continuously a substantially gainful occupation. United States v. Matory (C. C. A.) 71 F.(2d) 798. That was the effect of the question asked each of the experts here.

In marshaling testimony in former cases, this court has repeatedly considered that given by doctors expressing an opinion as to the total and permanent disability of the insured or his inability to follow continuously a substantially gainful occupation; those terms having been used interchangeably without objection. Testimony of that kind was taken into account in four cases submitted during the term at which this one was submitted and recently decided. United States v. Brown (C. C. A.) 72 F.(2d) 608; United States v. Flippence (C. C. A.) 72 F.(2d) 611; United States v. Worsley (C. C. A.) 72 F.(2d) 776; United States v. Higbee (C. C. A.) 72 F.(2d) 773. For a further discussion of this question, see the concurring opinion of Judge McDermott in United States v. Steadman (C. C. A.) 73 F.(2d) 706, decided concurrently herewith, and I am authorized to say that Judge McDERMOTT concurs in this opinion. I think the testimony was competent.