UNITED STATES v. RYE.
No. 930.

Circuit Court of Appeals, Tenth Circuit.
April 5, 1934.

Randolph C. Shaw, of Washington, D. C. (W. F. Rampendahl and Philas S. Jones, both of Muskogee, Okl., on the brief), for the United States.

A. L. Brook, of Muskogee, Okl. (Eck E. Brook, of Muskogee, Okl., on the brief), for appellee.

Before PHILLIPS, McDERMOTT, and BRATTON, Circuit Judges.

BRATTON, Circuit Judge.

This is a suit on a war risk insurance contract. Trial by jury was waived. The court found that plaintiff became totally and permanently disabled on November 10, 1918, while the policy was in force. Judgment was rendered accordingly and the case came here on appeal.

It is contended that the finding of total and permanent disability is not supported by substantial evidence. A proper motion was interposed at the close of the evidence. That presents the question for review. The burden was upon plaintiff to establish by substantial evidence that he became totally and permanently disabled while the policy was in force. United States v. Rentfrow (C. C. A.) 60 F.(2d) 488; United States v. Thomas (C. C. A.) 64 F.(2d) 245; United States v. Pearson (C. C. A.) 65 F.(2d) 996; United States v. Harrell (C. C. A.) 66 F.(2d) 231. It, therefore, is necessary to review the evidence.

Plaintiff suffered ten gunshot wounds in line of duty at Metz, France, on November 10, 1918. He was sent immediately to an evacuation hospital and spent the ensuing eleven months and twenty days in base hospitals in France and in the New York City Hospital. He was wounded in both arms and shoulders. Pertinent parts of his testimony describing in detail the nature and extent of his injuries are set forth in footnote.[1]

[1] "* * * I received ten gunshot wounds at Metz, France, on or about the 10th day of November, 1918; * * * I could not use my right hand most of the time while I was in the hospital; I have noticed some improvement in my right hand since my discharge from the hospital, but I can't write very long at a time; my fingers of my right hand go together; they are too stiff to close when I get it in a writing position and after writing twenty or thirty minutes at a time these two outside ones draw down and the two inside joints would raise up and cramp in there; I can press down on this hand that way and spread it out; I received one gunshot wound in my right hand in the index finger and two in the back of the right hand and one in the wrist and one in the fleshy part of the arm, three in the right shoulder and one in the right side and one in the left hand; * * * I also received a machine gun bullet through the upper part of the left arm, severing the nerves running out through the back of the forearm; I had a tendon of the left thumb cut on a piece of glass, perhaps three months before the discharge, that severed the tendon; I shave with my left hand; sometimes working with my left hand up, it becomes numb through the hand and forearm; * * * I got struck in the left arm with a machine gun bullet about midway between the elbow; the bullet in my left arm did not strike a bone; it severed a nerve; the other bullet struck a bone; the wound in the knuckle joint of the fourth finger and the one just above that cut the bone in two and there is an inch and a half of the bone that can't even move, leaving a stiff finger with both tendons severed; they claim that this one tendon grew back again; the one through the left arm wrist was an incomplete fracture; the one on the right arm just above the elbow left a scar three and a half or four inches long; the ball that struck the right arm above the elbow did not affect the bone; all these bones were broken above it; I got three bullets in the shoulder; this bullet in that shoulder hit the humerus, the head of the humerus, almost completely destroying it; a ball went into this joint and the end of the scapula, and tore that away; a

That testimony is not contradicted in any material respect. Dr. Joblin examined him before his discharge and many times since. He described the insured's condition[2] and stated that in his opinion the disability had been total and permanent since the date of discharge. Dr. Neely, formerly employed by the government as an X-ray specialist, examined him and made an X-ray of his right arm. It was his opinion that the disability was as complete and permanent as though the arm had been amputated at the shoulder. He did not examine the left arm.

Plaintiff was employed as straw boss on certain highway construction about a year, beginning in April, 1920. He did very little work; he merely directed the men. His father was county commissioner and he secured the position—a political one—through that source. His father did some of the work for him. He was there only about half the time and carried his arm in a brace. When his father's term of office expired, he lost his position. He and his wife operated a small grocery for about six or eight months. The stock was worth from $300 to $400. Sometimes he waited on customers and sometimes she did. She did it alone when he did not feel well. He then tried to raise chickens. He could not mix the feed, nor clean the houses, nor even gather eggs at times. He conducted a small restaurant for about two months. Two women cooked and served at the counter. He attended the cash register and cigar counter. Each of the ventures was a financial failure. He was employed as corral foreman at a highway construction camp for two or three months. The work was light, but he was unable to perform it and was discharged on that account. He was given vocational training for a clerical position in railway service, but due to his physical condition was unable to secure a position of that kind. He applied to Magnolia Petroleum Company for employment and was rejected for like reason.

▇▇▇ Total and permanent disability, as that term is used in a case of this kind, means inability to follow continuously a substantially gainful occupation. It has been held that in-

---

piece of that shrapnel went in there; it was the eighth shrapnel and machine gun bullets that went in. * * *"

2 "* * * I have examined him frequently for the Veterans Bureau; they asked for examinations several times; they always referred him to me and I have examined him frequently; from my knowledge of his condition and the examinations and the x-ray showing and finding, my opinion is that he was permanently and totally disabled at the date of his discharge; I should not think that he would be physically able to serve as a bookkeeper; I have had an occasion to examine his left arm; he had a machine gun bullet through his left arm and severed the nerve, causing numbness; * * * He uses his arm; so far as the joint and bone, there is no movement; he has taught himself to use the muscles until he uses his whole shoulder somewhat better; the wound was still open and running at the time I examined him in 1919 and he was still having some discharge from his arm; I have examined him since; the condition of the arm is no better, but he has the use of his muscles, so he can use his muscles; the condition of his arm is practically the same; the difference between the arm now than if it was off, so far as usefulness is that if it was off he would be rid of the pain; I have come in contact with one-armed men in the practice of my profession in about the same condition as the plaintiff that could carry on; this man suffers with arthritis all the time; he has an inflammation; you can work the arm and feel the bones grate together; and whenever he moves this arm it causes him pain; he is just about the same as a one-armed man, so far as usefulness of this arm is concerned; there is no fracture through the other arm; I am his family physician; I have never advised him to have this arm taken off; I would not advise it; probably there are a lot of occupations that he could carry on, whether or not he was a one-armed man.

"The Court: Dr., tell me about this left arm; what do you consider the condition of that? A. The wound was right through the arm.

"The Court: Not so much about the arm, but as to the impairment? A. It causes numbness and it is very intense.

"The Court: Is that a continuous condition? A. It is practically continuous; there is more or less numbness in these fingers all the time.

"The Court: Would you regard him, then, as in the same situation as an ordinary one-armed man if he had his arm off? What in your opinion would be the effect of that, whether he would be able to carry on with his left arm? A. Well, it is hard to tell, because these nerves regenerate more or less and you could not tell how much use he would have of that if he had to use it constantly.

"The Court: You say it is your opinion that he would not be normal with his right arm off? A. No, sir, not normal."

capacity of one arm does not constitute such disability. United States v. Ivey (C. C. A.) 64 F.(2d) 653; United States v. Thomas (C. C. A.) 53 F.(2d) 192; Hobin v. United States (D. C.) 59 F.(2d) 224. But this case goes far beyond that point. The insured here has no use of one arm and the other is seriously impaired. He approaches closely the condition of an armless man. In addition, he suffers almost continuously, wears a brace or sling most of the time and frequently places his arm in a stationary position to alleviate the pain. When it becomes extreme, he takes medicine to relieve it. He can write only twenty or thirty minutes with his right hand and he is unable to write any with his left. He is compelled to shave with his left hand.

Despite this deplorable condition, through commendable courage, he worked some but it was periodical, punctuated with frequent interruptions caused by his physical condition. One may work spasmodically with frequent interruptions and changes in consequence of his disability and still be unable to follow continuously a substantially gainful occupation. Total and permanent disability does not necessarily require a bedridden condition. In Nicolay v. United States (C. C. A.) 51 F. (2d) 170, 173—frequently cited with approval—it was said:

"An insured who is able to work only spasmodically, with frequent interruptions or change of jobs made necessary by his condition, cannot be said to be able to work with substantial continuity. Again, the word 'impossible' must be given a rational meaning; it cannot fairly be said that it is 'possible' for an insured to work because, under the stimulus of a strong will power, it is physically possible for him to stick to a task, if the work is done at the risk of substantially aggravating his condition. * * *

"No hard and fast rule can be laid down to the effect that, if the insured works a certain length of time, he cannot recover. The nature of the work done, the circumstances under which it is done, the character of work the insured is equipped to do, and perhaps other circumstances, all enter into the equation. While the rule may be difficult of application, it is nevertheless a simple one, and

it is that the question of the totality and permanence of the disability is a question of fact for the jury, if the evidence is such that reasonable men may differ as to the answer."

Appropriate application of that exposition of the constituent elements of total and permanent disability in a case of this kind convinces us that the finding of the trial court is supported by substantial evidence. Compare United States v. Pearson, supra. In reaching this conclusion we bear in mind that inability to pursue a pre-war occupation is not the test. Plaintiff was a pumper, tool dresser, and roust-about in oil fields before enlisting. If he is unable to pursue either of those occupations but can follow continuously some other substantially gainful work, he is not totally and permanently disabled. United States v. Howard (C. C. A.) 64 F. (2d) 533; United States v. Luckinbill (C. C. A.) 65 F.(2d) 1000. He has only a seventh grade education, knows nothing of any mechanical trade, and has suffered complete incapacity of one arm and serious impairment of the other. He tried to work but could not do so, and his efforts were not confined to his pre-war occupation. He should not be penalized for making the effort.

■■ It is further contended that the court erred in awarding recovery from November 10, 1918, the date of injury, instead of October 31, 1919, the date of discharge. Appellee alleged that he became totally and permanently disabled on the former date and the court expressly so · found. Apparently through inadvertence he prayed for recovery from the subsequent date. The allegation of disability was enough to impart notice that he sought recovery from that date and would be entitled to it if the proof sustained the allegation. The discrepancy in dates was not prejudicial. Appellant was confined in hospitals throughout the period in question and there can be no doubt that he was then totally and permanently disabled. It is settled law in Oklahoma that the prayer of a petition does not determine the kind or measure of relief to which a party is entitled. Superior Oil Corporation v. Matlock (C. C. A.) 47 F. (2d) 993. The contention lacks merit.

The judgment is affirmed.