## UNITED STATES v. HIGBEE.
### No. 1010.

Circuit Court of Appeals, Tenth Circuit.
Aug. 17, 1934.

774

Thomas E. Walsh, Atty., Department of Justice, of Washington, D. C., and John S. Boyden, Asst. U. S. Atty., of Salt Lake City, Utah (Dan B. Shields, U. S. Atty., and Edgar C. Jensen, Asst. U. S. Atty., both of Salt Lake City, Utah, on the brief), for the United States.

Oscar W. Worthwine, of Boise, Idaho (Joseph G. Jeppson and Jess Hawley, both of Boise, Idaho, on the brief), for appellee.

Before LEWIS, McDERMOTT, and BRATTON, Circuit Judges.

BRATTON, Circuit Judge.

William J. Higbee, hereinafter called insured, recovered upon a war risk insurance contract. He enlisted August 8, 1917, and was discharged October 14, 1918. The policy lapsed December 1, 1918, unless he became totally and permanently disabled prior to that time. The case was tried to a jury, and the only question presented is whether the finding of total and permanent disability is supported by substantial evidence.

Insured's asserted disability is acute bronchial asthma. He had a mild form of it before enlisting, but it did not interfere with his ability to earn a livelihood. He was employed regularly. In addition, he delivered papers early in the morning before beginning the day's work. He was stationed at Camp Kearney soon after enlisting. They had no tents there—just an open field. He and others laid out the land, pitched tents, and then were assigned to special detail, preparing for firing practice, stringing wires, and other work of that nature. He was subjected to severe exposure, slept in wet clothes, and contracted a cold. There being no hospital, he was treated in his tent. Removal of his tonsils was recommended. He thereafter contracted cold easily and often. The tents had no heat in them; he had only one blanket; that was insufficient; he used his overcoat for cover, but frequently slept cold. He was removed by ambulance to the base hospital and kept there about two weeks. Two or three months later he began suffering with shortness of breath. He gasped for breath, and was again removed to hospital. He could not lie down in bed, perspired so freely that it was necessary to change his mattress, and suffered frequently thereafter. He did only light work, such as handling mail or driving mules hitched to a sprinkling wagon. He was in hospital seven or eight times, was rejected for overseas duty on account of his condition and then assigned to the Development Battalion, an organization composed of men not quite physically fit. He could walk very little, wheezed and gasped for breath often, could not lie down at night, and had to keep his collar open all the time. He frequently could not walk to the mess hall, and his meals were brought to him. While in hospital adrenalin was administered to him hypodermically every two hours. He was discharged upon a surgeon's certificate of disability, and was told that nothing could be done for him. He was advised to go home and rest and that the change in climate might do some good. After returning home, he continued to wheeze, choke, and suffer. He secured employment from the Utah Copper Company as electrician helper, but could not do the work. The electrician requested another helper the second day. Insured was then assigned to the substation—an easier position. His duties were to watch the switches, and when they kicked out to put them in again. He was off duty part of the time, and when at work his superior frequently sent him under the conveyor belts—a dark cellar place— to rest an hour or so. Other employees protected him against being observed because it was a violation of the rules to loaf while on duty. That position became too hard for him, and he was transferred to a still lighter one— helping wind motors. He was given short and light jobs; the men helping him all they could. He took vocational training in Salt Lake City from October, 1919, to May or June, 1923. While doing so, he received treatment at the Veterans' Bureau there, and sometimes he was absent for several days on account of illness. He took a course in accounting, but was unable to secure employment because of his condition. He then secured a position in the abstract office of his brother-in-law. It lasted a month or six weeks. He suffered with headache and missed about half the time. Due to his condition, he was compelled to terminate the employment. He tried to sell automobiles, but that effort lasted only two months. He could not do the work, and was compelled to wire his father for money with which to return home. He became a traveling salesman for another company. He was unable to produce business be-

cause he lost half of the time from work. At the end of four months, and after much complaint from the company, he was discharged. He could not find another job, was in debt, and could not pay rent. In these circumstances, his wife went to live with her relatives, and he returned to his father's home. His father was engaged in the business of cutting lawns, tending furnaces, and polishing floors. He employed several men in that work. Insured worked for his father about two years. His weekly salary was first $25 and later $30. He lost two or three days a month, often failed to begin work on time, went to the hospital once, and was inefficient throughout that period. His father was required to employ others to do the work he was supposed to perform. He quit because he was unable to do the work and knew that he was receiving unearned money. He afterwards became a salesman for a washing machine company, and held that position a month or six weeks. It was too exacting, and he was compelled to quit. He did nothing for about nine months, and then became associated with a group of ex-service men engaged in the sale of washing machine powders; his duties being to care for the office and telephone. He lost much time, sometimes did not go to the office for several days in succession, and sometimes the office was closed for two weeks on account of his condition. The venture was a failure, and his father was required to lend him $200 during that time. He did nothing for eight or nine months after that venture ended. He then tried to work for Bradstreet Company, a local concern in Salt Lake City. His salary was $100 per month, later reduced to $80, and finally to $70. Others received $150 per month. The difference was due to the fact that his physical condition rendered it impossible for him to do a full measure of service. Sometimes he did not go to work; sometimes he went and was compelled to return home; sometimes other employees helped with his work because it was understood by all, including the superintendent, that he was suffering from a disability.

Throughout these several periods of employment, he self-administered adrenalin frequently and smoked a preparation often. He suffered extreme attacks at times, was rushed to a hospital on one occasion, and his relatives were summoned to his bedside. He frequently did not go to bed at night. Sometimes his wife arranged him in a chair, fixed the fire so that he would not get cold, and he spent the night that way. Insured testified to these facts, and his testimony was corroborated in its major aspects by others, including his wife, father, fellow employees and associates.

Dr. Root examined insured in January, 1925. He testified that at that time he was suffering from bronchial asthma; that he was full of musical rales, and had exceeding difficulty in breathing. Dr. Clawson first treated him in 1930, giving him morphine, adrenalin, atrophine, and ephedrin, and had him inhale amyl nitrite with no success. Dr. Root said that in his opinion insured was totally and permanently disabled at the time he first treated him, and Dr. Clawson said it was one of the severest forms of asthma with which he had ever come in contact, and that in his opinion insured was totally and permanently disabled at the time of his discharge. The government submitted pertinent evidence, but it merely presented an issue of fact for the jury.

There can be no doubt that insured suffers from an acute form of bronchial asthma. A surgeon in the Army called it a severe form, and certified that he was disabled with it. That certificate caused his discharge in October, 1918, at a time when men were needed badly in the armed forces. He has worked since then, but it apparently was done through a commendable effort to earn a living. Total and permanent disability does not require that one be an invalid or confined to his bed. He may work spasmodically, with frequent interruptions, caused by his physical condition, and still be totally and permanently disabled. Nicolay v. United States (C. C. A.) 51 F.(2d) 170; United States v. Rye (C. C. A.) 70 F.(2d) 150. And work done under pressure of necessity, when health requires rest, does not necessarily disprove disability. The jury may well have found that insured was totally and permanently disabled, that his condition required rest and inactivity, but that the inescapable necessity to earn a livelihood for himself and his family spurred him to work with injury and aggravation of his physical condition. If so, he is not barred from recovering upon his contract. Barksdale v. United States (C. C. A.) 46 F.(2d) 762; United States v. Phillips (C. C. A.) 44 F.(2d) 689; United States v. Spaulding (C. C. A.) 68 F.(2d) 656. Neither the fact that he received vocational training nor his long delay in instituting this action is conclusive against his right to recover. Both are circumstances for consideration of the jury under appropriate instructions of the court. Lumbra v. United States, 290 U.

S. 551, 54 S. Ct. 272, 78 L. Ed. 492; United States v. Nickle (C. C. A.) 70 F.(2d) 873.

■ We think there is substantial evidence to support the finding of total and permanent disability. Accordingly the judgment is affirmed.