## EVERHART v. STATE LIFE INS. CO.
### No. 9943.

Circuit Court of Appeals, Sixth Circuit.

April 2, 1946.

M. C. Harrison, of Cleveland, Ohio (Marvin C. Harrison, of Cleveland, Ohio, and Robert H. Rice, of Elyria, Ohio, on the brief), for appellant.

Thomas V. Koykka, of Cleveland, Ohio (C. M. Horn, McKeehan, Merrick, Arter & Stewart, all of Cleveland, Ohio, on the brief) and Joseph A. McGowan, of Indianapolis, for appellee.

Before MARTIN and McALLISTER, Circuit Judges, and FORD, District Judge.

MARTIN, Circuit Judge.

On January 28, 1921, while insured in The State Life Insurance Company by the terms of a twenty year endowment policy containing specific clauses pertaining to waiver of premiums and total and permanent disability benefits, William Robert Everhart, a brakeman in the employ of the Baltimore & Ohio Railroad Company, sustained severe personal injuries in the performance of his regular duties. He received $15,000 from the railroad company in settlement.

Immediately after the accident which occurred in the railroad yards at Elyria, Ohio, he was taken to St. Joseph's Hospital in Lorain, where bones were forthwith removed from his crushed skull. He was unconscious for fourteen days and remained in the hospital for some six weeks before being removed to his home. The course of his health, symptoms, treatments and activities will be reviewed when we come to discussion of the evidence in the case.

In response to Everhart's delayed proof of disability, the insurance company on February 3, 1922, began, as of January 1, 1922, to pay him fifty dollar monthly total and permanent disability benefits until 39

such instalments had been paid. In further recognition of its obligation under the policy, the insurer waived payment of the annual premiums for the years 1922, 1923 and 1924. These monthly payments and annual premium waivers were discontinued by the insurance company on April 28, 1925.

More than seventeen years later, on August 20, 1942, Everhart brought suit on the policy in an Ohio court to recover accrued monthly disability payments from April 28, 1925, with interest thereon, and to recover also the face amount of the policy which matured on April 28, 1939.

In its answer in the United States District Court, to which the action was removed on the ground of diversity of citizenship, the insurance company raised inter alia the issue that "prior to April 1, 1925, the plaintiff had so far recovered from his injuries as to be able to engage in a gainful occupation."

The Total and Permanent Disability clause of the insurance policy in controversy provides:

"If the insured, after paying at least one full annual premium and before default in the payment of any subsequent premium and before attaining the age of sixty years, shall become wholly and permanently disabled by bodily injury or by disease, so that he is and will be permanently, continuously and wholly prevented thereby from performing any work for compensation or profit, or from following any gainful occupation, the Company, upon receipt at its Home Office of due proof of such disability of the insured as may be required by the Company, will grant the following benefits: First—Will waive payment of premiums thereafter becoming due. Second—In addition will pay to the insured a monthly income equal to one per cent. of the original amount of insurance (exclusive of any accidental death benefit). The first monthly payment will be made upon satisfactory proof of disability as above provided, and the subsequent monthly payments will be made on the first day of each month thereafter during such disability, provided, however, that such monthly payments shall in no event continue beyond the date stated on the first page hereof [April 28, 1939] on which this Policy is payable to the insured, if then living.

"Any premiums so waived, or monthly income payments made, under this provi-

sion, shall not be a lien on or charge against this Policy, in any settlement hereunder, and the values in the table of options on the first page hereof shall apply in the same manner as if the premiums had been paid by the insured. * * *

"Proofs similar to those originally required of such continuous disability must be furnished at any time, if requested by the Company, but not oftener than once a year, and if the insured should fail to furnish such proofs, or should so far recover as to be able to engage in any gainful occupation, the obligation on the part of the Company to waive payment of premiums and pay to the insured a monthly income shall cease, and the insured shall resume payment of premiums in accordance with this contract beginning with the first premium becoming due after failure to furnish such proofs or after the date of such recovery.

"If there be any indebtedness on account of or secured by this Policy the accrued interest thereon shall be deducted from each income payment. * * *"

In due course, the cause came on for trial to a jury in the district court. In addition to the plaintiff, who did not take the stand in his own behalf but was called by the defendant for cross-examination, fourteen witnesses testified. Numerous exhibits were received in evidence. When both sides had rested upon the proof, the attorney for the defendant moved for a directed verdict upon four grounds: (1) the statute of limitations, (2) alleged abandonment of contract by the insured, (3) estoppel by acquiescence, and (4) the alleged ability of the insured since the end of 1924 to engage in a gainful occupation.

The trial judge reserved ruling on the motion and submitted the case to the jury. The jury was instructed that "some casually or incidentally earned income would not defeat the plaintiff's right to recover under the policy, if it be proved that he was unable on account of physical or mental means, or condition of health, to follow regularly some substantially gainful occupation." The court charged further that should the jury find that the plaintiff "did so recover in health and physical capacity that he was able to work with fair regularity for compensation or profit, or at a gainful occupation," the verdict must be for the defendant. The comment was added: "That is the main issue in this case, almost the sole issue."

Six special interrogatories put by the court to the jurors were answered by them as follows: 1. Did the defendant Insurance Company send a notice to the plaintiff requesting additional proof of continuing disability? No. 2. Did the defendant Insurance Company send a notice to the plaintiff that the policy would lapse unless the premium due April 28, 1925, was paid? Yes. 3. If you find that the request for additional proofs was sent, then was such request received by the plaintiff? No. 4. If you find that such notice of lapse of policy was sent, then was such notice received by the plaintiff? No. 5. Was Everhart totally and continuously disabled from April 1, 1925, to April 28, 1939? Yes. 6. Do you find that, at some time after his accident, Everhart did so far recover from his injuries "as to be able to engage in a gainful occupation" as the court has defined that phrase to you? No.

In addition to the foregoing answers to the special interrogatories, the jury returned the following general verdict: "We, the jury, on the issue joined, find for the plaintiff with recommendation of compromise on award."

Holding that the verdict of the jury is against the weight of the evidence, is not sustained by the evidence and is contrary to law, the district judge entered judgment for the defendant insurance company on its motion for judgment non obstante veredicto. In his opinion, the judge reasoned to the conclusion, moreover, that the action is barred by the statute of limitations, in consequence of which it was deemed unnecessary to consider the defenses of abandonment, laches and estoppel.

On the factual issue of total and permanent disability the district judge held that the work-record of the plaintiff barred his recovery on the policy. Upon this branch of the case, the court's opinion declared:

"There is no doubt that the plaintiff's injury would have been classified as permanent and total if he had not returned to work. The evidence is clear and convincing that the plaintiff suffered an injury to the head which caused impairment of speech, some paralysis of the limbs, and traumatic epilepsy. The witnesses who testified to his work admitted that he would not have been employed if the employers had known of his epilepsy. His refusal to work would have been justified. Since he did work, however, the provisions of the policy control, and his work-record dis-

qualifies him as to benefits provided for 'total and permanent disability' which prevent the insured 'from performing any work for compensation.' The work-record is too extensive and the earnings too great to be considered mere casual or incidental employment. (About $1,000 a year for 4½ years.)

"The plaintiff received thirty-nine monthly payments for disability. Then the defendant learned that the plaintiff had been working and declined to make further payments. Such refusal was justified under that provision of the policy which provided that payments cease if the insured should fail to furnish proof of continuous disability 'or should so far recover as to be able to engage in any gainful occupation.' "

On appeal, Everhart insists that there was substantial evidence to support the finding of the jury that he was actually totally and permanently disabled during the full period for which he claims monthly disability benefits; and that his work record during such period was insufficient to bar his recovery as a matter of law.

His sister, two former wives from each of whom he had been divorced, and several medical witnesses, testified in his behalf.

His first wife, now Mrs. Herbert, was living with him when he was injured in 1921. She described him as normal in every respect before the accident. After six weeks at St. Joseph's Hospital, following his injury, he was removed to their home, where she observed an impediment in his speech and a "starey" look in his eyes. She noted that it became difficult for him to hold small objects, such as a pencil; and that "he just couldn't grasp things, like he didn't hear you, that he just didn't understand." He became subject to epileptic seizures, sometimes twice a week and occasionally at two-week intervals. She advised him that he shouldn't go to work; she knew he was unable to do so. An operation was performed on his head at the Cleveland Clinic Hospital in an attempt to cure his epileptic seizures, but without beneficial result. Indeed, immediately following this operation, he began to have one epileptic seizure a week. According to Mrs. Herbert, his condition remained substantially unchanged from the time he returned home after his injury until they were divorced in 1924. The last week they lived together he was working, but she did not know where.

Everhart's second wife, now Mrs. Gishman, was the second witness called. She married him in 1929, lived with him four or five years, and divorced him "around 1938." At the time of their marriage, she did not know that he was subject to epileptic seizures, but had observed that he "didn't talk plain" and limped a bit when he walked. Soon after their marriage, however, she became aware that he suffered from epilepsy, sometimes having two or three seizures a week. The attacks were never as long as a month apart. When seized, he would sit down, or, if he couldn't, "would go headlong." Once he fell down stairs into the cellar of the house in which they were living. According to the witness, Everhart's mind, after a spell, would be blank for a few days; "he wouldn't know what he was doing." The testimony of the second wife corroborated that of the first: Everhart could not grip small objects, and had difficulty in understanding. While married to Mrs. Gishman he worked for the Otis Company intermittently; or, in the words of the witness, "he wasn't steady at it."

"He would work," she testified, "then he would get those spells and he would be off, and go back to work, get another spell, then he would go back to work." She stated that they did not live on the wages which he earned, but on expense money sent them by his sister. He did no work around the house and could not even shave himself with his right hand. She considered his condition on the day of the trial about the same as it had been during all the time she had known him.

Everhart's unmarried sister, a city school principal who had been a teacher for forty-four years, testified that, prior to his injury in 1921, her brother was a normal, hard-working person. It was at least six months after the accident before he could talk even as a small child would, by "putting the words together to make a sentence." She described the paralyzed condition of his arm and hand, and stated that he could not handle his silver at the table; nor could he hold a screwdriver or hammer, or do "the ordinary jobs a man or woman would do around the house." She stated that there was never a time since he was hurt when he could work normally, talk normally, or apparently think normally. Asked whether there was ever a time,

after his injury, when in her opinion her brother was able to do any kind of ordinary work, she replied: "Not any; over any long period of time, either." He might try something, but when an epileptic attack came on, "he had to give it up."

Miss Everhart personally helped keep her brother's "home together," by sending money for his support as well as that of his wife. Sometimes, she paid their rent directly to the landlord; at other times, she sent weekly payments to take care of "clothing needs." She testified that, due to his epileptic seizures, her brother worked only intermittently.

The medical testimony will now be reviewed.

Dr. Frank A. Lawrence of Elyria, Ohio, testified that he treated Everhart professionally sometime within a year after the accident and at various intervals down through 1924. He was called in to see the patient because of his epileptic, or convulsive seizures. The doctor stated that there was no particular treatment for the trouble, except general care. His diagnosis was permanent traumatic epilepsy. In the opinion of the witness, Everhart has never been a normal man since the accident and has been continuously totally disabled to perform manual labor. Seeing and talking to appellant casually from time to time from 1924 to 1936, and again professionally in 1936, Doctor Lawrence was of opinion that there was no particular change during that time in the man's abnormal symptoms of permanent epilepsy.

Dr. Thomas A. Burke, of Cleveland, qualified as an expert in the care of mental cases and in head-surgery diagnosis. He had made a complete examination of Everhart shortly before the trial. His physical findings were a compound fracture of the skull, which had been treated by trephining. The operation had left a depression of three-eighths of an inch and an opening about an inch in diameter. The part of the brain affected was the motor area. The muscles of the face and the right arm were found very much contracted; and a definite atrophy of the right leg was observed. Everhart's speech was described as quite impaired: "He would start and stutter or stammer and then proceed again." His condition was considered to be permanent. From his own examination, Dr. Burke expressed the opinion that Everhart is now permanently incapacitated to perform manual labor. Assuming the facts stated in a hypothetical question, based on the case history, Dr. Burke asserted the opinion that at no time since the accident was Everhart "able to do work."

Dr. Siegfried Baumoel, specialist in psychiatry and neurology, had made a neurological examination of Everhart a few days before the trial. He found a weakness of the right side of the "lower face," a marked weakness of the right hand, a peculiar position of the fingers resembling a "claw hand," and purposeless movements of the fingers—that is, a lack of perception of the form of objects put into his hand. This signified a brain lesion. The doctor observed abnormal reflexes in the right hand, indicating damage in the structure of the controlling brain cells. He noted disaphasia, a form of disturbance in speech caused by the damage to or destruction of the brain cells controlling the coordination of the various organs necessary to expression. Also, hesitance in walking, uncertainty of self, was observed in Everhart. A pronounced mark of head injury in the motor area of the brain was apparent. In reply to a hypothetical question, based on the assumed case history, Dr. Baumoel expressed the opinion that Everhart is permanently disabled to perform any work. He declared that his opinion would not be changed by assuming that Everhart had worked intermittently; that the man should have been advised not to work; that he would have so advised; and that, if Everhart could perhaps have done some work, great risk had been involved in its doing, both to himself and to those around him. Dr. Baumoel gave a clear-cut description of the manner in which irritation of certain portions of the brain changes electrical and chemical constituents of brain cells, causing them to discharge suddenly electrical waves which travel down the nerves. He stated: "Epileptical seizures in a case like his are due to adhesions that form between the brain and the covering of the brain. We know this man had a severe brain injury, destruction of the brain tissue; he had oozing out of brain tissue. In the healing process there is a scar forming on the surface of the brain, which becomes adherent to the membranes that cover the brain. That scar in the course of time shrinks like every scar, and in the process of shrinking it pulls on the brain and causes the irritation which sets off the electrical storm, the epileptic fit."

352

Two and one-half years after his accident, Everhart had been taken to the Cleveland Clinic Hospital for a brain operation. His hospital case record was introduced in evidence. His age was stated as 35 years. The diagnosis was given as: "Depressed fracture of the skull. Jacksonian epilepsy." Attacks of convulsions were noted as his chief complaint. In the entry of his clinical history, it was asserted that Everhart's skull had been crushed, two and one-half years previously, in the left parietal temporal region and that he had been unconscious for fourteen days. Right sided paralysis had gradually begun to clear after three weeks, leaving only residual of paralysis in face and hand. Frequency of convulsions was said to be every three or four weeks. The observation was made that "the patient finds it hard to express himself." The record showed that the patient went to Dr. Crile, whose impression was thus noted: "old break left side of skull, pressure traumatic epilepsy. Jacksonian epilepsy, depressed fracture of skull, plastic operation." Dr. Crile, in operating, excised the old scar and dissected "down to the pericranium, which was elevated with parietal elevators with Hudson drill, and the bone cut away with Rongeur until it showed normal thickness on all sides." The dura beneath this bone showed some opacity. It was not opened. Closure had been made with interrupted silk sutures. Several reports were written from the Cleveland Clinic Hospital in the form of letters to Dr. Lawrence, the original attending physician. In one of these letters, it was stated that the prognosis in the case was extremely doubtful.

This prognosis proved to be correct. The end of the road for this unfortunate epileptic was the Poor House, officially and more euphemistically called the Lorain County Infirmary. He was admitted there as a county charge in October, 1936, on a certificate showing that he was unable to work. The superintendent of the institution testified that, since entering the county home, Everhart has been subject to epileptic seizures, sometimes at weekly intervals and sometimes at intervals of two or three weeks. The witness stated, moreover, that the victim is unable to "hold a conversation," or to do any manual labor; that he cannot hold a knife, or hoe handle, or anything of the sort, and can not even cut seed potatoes for planting on the farm.

Payroll records were introduced by the insurance company, showing periods during which Everhart worked for several different companies.

From these records, it appears that he was employed by the National Tube Company, in Lorain, for 23 days in December, 1924, and received $95.05 for his labor. The timekeeper who produced the payrolls conceded that he would not hire a man if he knew he had epilepsy.

The employment manager for the Mullens Manufacturing Corporation testified that appellant worked there from May 15 to June 19, 1928, and was paid $96.20; but that the witness would not have employed a man who, following an accident, "had epileptic attacks every once in a while." To obtain employment, Everhart had misrepresented his state of health. He had stated that he had no physical defects.

During the short period from June 19 to July 31, 1928, he worked under two different check numbers for the Transue & Williams Steel Forging Corporation. For this work, he was paid $146.09. The employment manager who introduced the work records for the company said that Everhart left for no apparent reason; he just "didn't come to work."

Appellant did not take the stand in his own behalf, but was called by the appellee for cross-examination. He stated that the insurance company, upon receipt of information that he was working, stopped sending his monthly checks. At that time, he was in the employ of the Columbia Steel Company, which "fired" him upon learning that he was subject to epileptic attacks. It is a fair inference that, in his attempt to earn a livelihood, Everhart endeavored to conceal the fact that he had epilepsy; for he had come to realize that he would be discharged whenever and wherever his infirmity was no longer a secret.

Surely, it could not seriously be contended, in the face of the case history and medical testimony which has been reviewed, that these brief spasmodic working intervals would bar, as a matter of law, Everhart's recovery of permanent and total disability benefits under the policy.

It is earnestly contended, however, that his work record with the Otis Steel Company from February 12, 1929, to about January 1, 1933, during which his pay for the approximate four-year period totalled some thirty-two hundred and sixty dollars, bars

recovery in this action. It was stipulated that, during this period, Everhart had received and endorsed eighty-nine payroll checks as wages received by him for his service, labor and work performed at the Otis Steel Company's plant in Cleveland. On cross-examination, he testified that he was employed there as a roller's helper, handling cold rolls. Beyond this, the record is silent as to the character of his work there.

(1) The important question presented is whether the district judge erred in setting aside the jury verdict for appellant and entering judgment non obstante veredicto in favor of the appellee. The jury found that Everhart was, as a matter of fact, totally and continuously disabled from April 1, 1925, to April 28, 1939, and did not, after his accident, so far recover from his injuries as to be able to engage in a gainful occupation.

Whether a man has been permanently and totally incapacitated by an injury is both primarily and ultimately a question of fact. Authorities are elucidating only to the extent that aid may be received from the principles laid down by the courts relative to the appropriate means of resolving an issue which is inherently a question of fact. There are hundreds upon hundreds of opinions from state and federal courts pertaining to permanent and total disability benefits under policies issued by insurance companies and beneficial associations. There are also numerous reported opinions of the federal courts relative to war risk insurance. We shall attempt no exhaustive review of these authorities, but shall discuss or cite a selected few, from which we think guiding principles are derivable. First, we should look to the status of the law of Ohio to ascertain if a controlling decision may be found. The only Ohio authority cited in the opinion of the district judge with respect to the question of permanent and total disability is Rose v. New York Life Ins. Co., 127 Ohio St. 265, 187 N.E. 859, a case wholly differentiable upon its facts from that at bar. The main issue decided there was that policy requirements as to notice and proof of disability had not been met by the assured, for the reason that to effect a waiver there must be words or conduct showing an intention to abandon or relinquish a known right. The first syllabus merely states that, where the meaning of a contract of insurance against loss resulting from total and permanent disability can be fully and clearly ascertained from the words of the contract itself, the court may not resort to surrounding circumstances or to the conduct of the parties for aid in interpretation.

In a later case, Gibbons v. Metropolitan Life Ins. Co., 135 Ohio St. 481, 484, 485, 486, 21 N.E.2d 588, 590, a judgment on the verdict of a jury for total and permanent disability benefits was affirmed. The trial judge, in charging the jury, had thus defined total and permanent disability: "By total disability we mean this: That he was completely unfitted and unable to perform the work that he had been pursuing up to the time that he did become disabled, should you find by a greater weight of the evidence that he did so become disabled. And with reference to the meaning of the words permanent disability, you are to consider not the whole span of his life, past and future, but what you find by the greater weight of the evidence to be the fact as to his total inability to work in the period covered by this lawsuit." This instruction was approved. Moreover, the Supreme Court of Ohio upheld the rejection by the trial court of the following special instructions requested by the defendant: "The court instructs you as a matter of law that if you find from the evidence that the plaintiff is physically able to engage in any work for wage or profit, then your verdict should be for the defendant. * * * The court instructs you as a matter of law that if you find from the evidence that plaintiff has failed to show that he is totally and permanently disabled so as to be unable to perform any work or engage in any business for compensation or profit, then your verdict should be for the defendant." The opinion writer observed that the words "permanent disability" and "total disability" are to be construed *liberally* and *not literally*. The language used is plain: "In case of doubt, provisions for the payment of total and permanent disability benefits must be liberally and fairly construed in order to give effect to, rather than frustrate, the true intent of the contracting parties. It is generally held that insurance policies should be given a liberal construction in favor of the insured. To construe the language 'totally and permanently disabled * * * to perform any work or engage in any business for compensation or profit' literally is to say that to entitle an insured to disability benefits

he must have become so utterly helpless as to be incapable of performing work of any kind for remuneration or profit. Such could not have been the intention of the contracting parties."

In Stuhlbarg v. Metropolitan Life Ins. Co., 143 Ohio St. 390, 398, 55 N.E.2d 640, 644, the highest Ohio court affirmed the judgment of the Court of Appeals upholding a verdict and judgment for the plaintiff in the Common Pleas Court, in an action to recover disability benefits under a life insurance policy. The evidence was found sufficient to support the verdict of the jury, where the insured had been given employment at fifty dollars a week by one of his brothers after the action was brought. The state Supreme Court asserted that the testimony indicated that the plaintiff was not mentally fitted for any responsible employment; that his disability existed at the time of the trial, and would continue probably indefinitely. This was deemed sufficient proof "to go to the jury on the question of permanency." Gibbons v. Metropolitan Life Ins. Co., supra, was cited with approval.

Appellee cites an unreported opinion of the Court of Appeals of Lake County, Ohio, in Zimmerman v. Travelers Insurance Company,[1] decided February 17, 1939. That case is distinguishable upon its facts from the case now before us. It should be observed, moreover, that the Zimmerman case antedated the announcement of the opinions of the Supreme Court of Ohio which have just been discussed.

We think that fundamentally the opinions of the Supreme Court of Ohio are in conformity with the rationale of Berry v. United States, 312 U.S. 450, 455, 456, 61 S.Ct. 637, 639, 85 L.Ed. 945. In that case, the trial judge had declined to grant the Government's motion for a directed verdict in a war risk insurance case. A jury verdict for the veteran followed. On appeal, however, the Circuit Court of Appeals for the Second Circuit reversed the judgment and dismissed the cause of action. The Supreme Court of the United States reversed the judgment of the court of appeals and affirmed that of the district court. Without summarizing the work record detailed in the opinion of the Supreme Court, it should suffice to say that the record there revealed no less effort on the part of the veteran than was made by Everhart

to earn a livelihood despite his severe physical and mental handicap. The comment made in the opinion in the Berry case would be equally applicable here: "Taking the evidence as a whole, the jurors, who heard the witnesses and personally examined the petitioner's wounds, could fairly have reached the conclusion that since his injuries petitioner never had been able, and would not be able thereafter, to work with any reasonable degree of regularity at any substantially gainful employment."

Citing Lumbra v. United States, 290 U.S. 551, 559, 560, 54 S.Ct. 272, 78 L.Ed. 492, the Supreme Court said, moreover: "It was not necessary that petitioner be bedridden, wholly helpless, or that he should abandon every possible effort to work in order for the jury to find that he was totally and permanently disabled. It cannot be doubted that if petitioner had refrained from trying to do any work at all, and the same evidence of physical impairment which appears in this record had been offered, a jury could have properly found him totally and permanently disabled. And the jury could have found that his efforts to work—all of which sooner or later resulted in failure—were made not because of his ability to work but because of his unwillingness to live a life of idleness, even though totally and permanently disabled within the meaning of his policies. * * * There was evidence from which a jury could reach the conclusion that petitioner was totally and permanently disabled. That was enough." The following opinions of United States Circuit Courts of Appeal were cited: United States v. Rice, 8 Cir., 72 F.2d 676, 677; Nicolay v. United States, 10 Cir., 51 F.2d 170, 173; United States v. Lawson, 9 Cir., 50 F.2d 646, 651; United States v. Godfrey, 1 Cir., 47 F.2d 126, 127; United States v. Phillips, 8 Cir., 44 F.2d 689, 691.

See also the following pertinent authorities, in accord with those cited by the Supreme Court in the Berry case: United States v. Meserve, 9 Cir., 44 F.2d 549, 552; United States v. Thomas, 10 Cir., 64 F.2d 245, 246, 247; United States v. Higbee, 10 Cir., 72 F.2d 773, 775; United States v. Francis, 9 Cir., 64 F.2d 865; Carter v. United States, 4 Cir., 49 F.2d 221; Ætna Life Ins. Co. v. Moyer, 3 Cir., 113 F.2d 974, 980; Metropolitan Life Ins. Co. v. Bovello, 56 App.D.C. 275, 12 F.2d 810, 813.

---

[1] No opinion for publication.

■ Not only the Berry case and the Lumbra case, but also United States v. Spaulding, 293 U.S. 498, 505, 55 S.Ct. 273, 79 L.Ed. 617, recognized that a man may have worked when really unable to do so and at the risk of endangering his health or life; and that, therefore, occasional work by one generally disabled because of impairment of mind or body does not as a matter of law gainsay total permanent disability. Of course, the character of the work done *may* be such as conclusively to negative permanent and total disability at an earlier time.

In the instant controversy, the district judge stated in his opinion that "there is no doubt that the plaintiff's injury would have been classified as permanent and total if he had not returned to work"; that "the witnesses who testified to his work admitted that he would not have been employed if the employers had known of his epilepsy" and that "his refusal to work would have been justified." With this situation existing, it would seem clear that the district judge acted in non-conformity with the reasoning of the Berry case and the other cases cited supra.

This court, in United States v. Gwin, 6 Cir., 68 F.2d 124, 125, 126, remarked that "a man should not be prejudiced by working when in justice to his own well-being he should not be doing so, or where he works only at the risk of serious personal injury to himself." This principle was again emphasized in Plocher v. United States, 6 Cir., 87 F.2d 860, 862, wherein Judge Hicks said: "We think that the determination of whether the veteran's industrial record destroyed his claim necessitates a finding upon the debatable question whether he acted upon sound judgment, or, affected by the vagaries of a disordered mind, took risks with his health or life. This question is peculiarly one for the consideration of a jury." The case was sent back to the district court for a jury's determination of the fact issues. In the substantially similar circumstances of the instant case, the jury has already decided the issues of fact favorably to the insured. There is, therefore, no present occasion for a retrial by jury.

■ Britt v. United States, 6 Cir., 59 F.2d 733, was a case involving epilepsy. In reversing a directed verdict for the defendant and remanding for new trial, this court declared: "The evidence of the medical witnesses in the face of his work rec-

ord leaves much for speculation, but interpreting it as the law requires most favorably to the plaintiff, we are not satisfied that it was too unsubstantial to submit to the jury." In Everhart's case, the cumulative testimony of the medical experts added to that of the lay witnesses carries far beyond the realm of conjecture to the preponderantly established fact that he has been totally and permanently disabled since his accident in 1921.

Galloway v. United States, 319 U.S. 372, 63 S.Ct. 1077, 87 L.Ed. 1458, in which a vigorous and logically reasoned dissent was written by Mr. Justice Black, with whom two other Justices concurred, is presented as a mainstay to support the ruling below. The language of the majority of the Supreme Court at pages 386 and 387 of the opinion in 319 U.S., at page 1085 in 63 S. Ct., 87 L.Ed. 458 is stressed. The primary issue presented in the Galloway case was: Did the veteran first become disabled while the war risk insurance policy was in effect? In the instant case, the question is whether the original total and permanent disability, admittedly existing while the policy was in effect in 1921 and for several years thereafter, continued throughout the period involved. In the Galloway case, the plaintiff failed to introduce evidence regarding his condition for a much longer period of claimed total and permanent disability than may be said of the appellant here. The proof of total and permanent disability throughout the entire period in issue, moreover, is much stronger in the case at bar than was true in the Galloway case. Each case must be decided upon its own particular facts. We do not find sufficient parallelism between the facts of the Galloway case and those disclosed in the record here to impel a holding that the appellant's nebulous work record, proven entirely by payrolls showing that he was not continuously employed during the four year period to which such great importance has been attached, should bar recovery. The essential difference in the two cases is that there is no question in the instant controversy that the appellant became totally and permanently disabled while his policy was in effect; while in the Galloway case that was an essential issue. After careful consideration of the circumstances of the Galloway case and of the dicta in the majority opinion of the Supreme Court, we do not conclude that there was any intention of upsetting the

unanimously pronounced doctrine of the Berry case.

■ (2) The district court held that failure by the insurance company to make monthly disability· payments was notice to the insured that the payment of premiums was no longer waived; that on the date when the next premium became due or at the expiration of the grace period thereafter "the insured could have paid the premium or have taken some action to enforce the obligation of the insurer to waive the premium"; and that, having done neither and having taken no action based on the contract for more than fifteen years, "the entire contract providing for disability payments became outlawed, and no action could thereafter be founded on it." In our judgment this was an incorrect interpretation.

The applicable statute of limitations is Section 11221 of the General Code of Ohio, which provides: "An action upon a specialty or an agreement, contract or promise in writing shall be brought within fifteen years after the cause thereof accrued." The statute would bar only. any particular disability-benefit instalment if an action for its recovery was not brought within fifteen years from the date it became due. See Pelton v. Bemis, 44 Ohio St. 51, 56, 57, 4 N.E. 714, in which the instalment principle is recognized. The right to sue on each instalment accrued when the monthly disability payment fell due and was not paid. Ætna Life Ins. Co. v. Moyer, 3 Cir., 113 F.2d 974, 981. Inasmuch as the right of action on each separate instalment accrued only upon default of payment·of that instalment, the bar of the statute of limitations runs separately against each separate instalment. An action brought immediately upon the nonpayment of an instalment benefit could not cover an anticipatory breach in the payment of future instalments. ˙One may sue to recover only such instalments due him as the insurer has failed to pay. In New York Life Ins. Co. v. Viglas, 297 U.S. 672, 681, 56 S.Ct. 615, 618, 80 L.Ed. 971, the Supreme Court pointed out that, to determine whether· a breach avoids the insurance contract as a whole, there must be considered what is necessary to work out reparations in varying conditions. Mr. Justice Cardozo reasoned thus: "The plaintiff does not need redress in respect of unmatured instalments in order to put himself in a position to shape his conduct for the future. If he is already in default for the nonpayment of a premium, he will not be in any worse predicament by multiplying the defaults thereafter. On the other hand, if his default is unreal because the premiums had been waived, the insurer will be estopped from insisting upon later premiums until the declaration of a lapse has been canceled or withdrawn. Besides, if the disability is permanent, there will be nothing more to pay." Cf. authorities collated in 81 American Law Reports 381, et seq.

The insurer was obligated by contract to waive the payment of premiums whenever, in fact, the plaintiff should become totally and permanently disabled, and to keep the policy in effect during such disability. No unlawful action of the insurance company could impose any duty upon the insured to pay premiums. As a matter of fact, however, the jury found that, while the insurance company sent appellant a notice that his .policy would lapse unless he paid the premium due on April 28, 1925, Everhart did not receive the notice. We are of firm conviction that the Ohio statute of limitations bars no benefit instalments payable to appellant, except those which fell due more than fifteen years before this action was brought on August 20, 1942.

■ (3) We need not pause long upon the insurance company's defenses setting up alleged abandonment of the contract by the insured and his alleged estoppel by acquiescence. In State Mut. Life Assur. Co. v. Heine, 6 Cir., 141 F.2d 741, we held, in a declaratory action on a· life insurance policy carrying disability benefits, that the term "abandonment" means the absolute relinquishment or renunciation of a right. There is even less justification here than there was in the Heine case for charging that the insured abandoned the contract. With respect to laches, the opinion of Judge Hamilton declared (Op., 141 F.2d 744) that, unless *equitable relief* is sought, the statute of limitations fixes the time limit within which an action must be brought. The instant action is an action at law. To establish a waiver, there must be shown an intentional relinquishment of a known right. Michigan Automobile Ins. Co. v. Van Buskirk, 115 Ohio St. 598, 605, 155 N. E. 186; Equitable Life Assur. Soc. v. Mercantile Com. B. & T. Co., 8 Cir., 143 F.2d 397; New York Life Ins. Co. v. Talley, 8 Cir., 72 F.2d 715, 718.

The jury found on substantial evidence that the appellee insurance company sent Everhart no notice requesting additional proof of his continuing disability. Consequently, he has been guilty of no default in failing to furnish such proof.

The judgment of the district court is reversed; the verdict of the jury is ordered to be reinstated; and in conformity with this opinion judgment for plaintiff upon the verdict of the jury, including interest at the lawful rate, is directed to be entered by the district court.