## UNITED STATES v. DOUBLEHEAD.
### No. 931.

Circuit Court of Appeals, Tenth Circuit.
March 31, 1934.

Randolph C. Shaw, Sp. Asst. to Atty. Gen. (W. F. Rampendahl, U. S. Atty., of Muskogee, Okl., Davis G. Arnold and John Mock, both of Washington, D. C., Attys., Veterans' Administration, on the brief), for the United States.

John A. Goodall, of Stilwell, Okl., for appellee.

Before PHILLIPS, McDERMOTT, and BRATTON, Circuit Judges.

McDERMOTT, Circuit Judge.

On June 30, 1919, John Doublehead, a Cherokee Indian, was discharged from the Army, and ceased paying premiums on his war risk insurance. After discharge, he returned to his home in Oklahoma, pottered around the house and his allotment, hauled a few loads of ties, got drunk occasionally, had nightmares, murdered a man in September, 1922, and was sentenced to death. While under the death sentence, Doublehead applied for a reinstatement of his war risk policy, in which he stated he was not totally and permanently disabled, and accompanied it with a report of physical examination made by the prison physician, disclosing that physically he was a first class risk. The Court of Criminal Appeals thereafter commuted the sentence to life imprisonment. Doublehead v. State, 27 Okl. Cr. 375, 228 P. 170. The application to reinstate was denied, and Doublehead died a natural death in the penitentiary, probably of malaria, in 1925.

Doublehead thus lived for six years after his policy lapsed without appreciating the fact that he had been totally and permanently disabled all those years. Nor did his mother realize such total disability until shortly before this action was filed by her on March 2, 1932, thirteen years after it is now alleged Doublehead was totally disabled.

The Supreme Court of the United States in Lumbra v. United States, 290 U. S. 551, 54 S. Ct. 272, 276, 78 L. Ed. 492, held:

"And in the absence of clear and satisfactory evidence explaining, excusing, or justifying it, petitioner's long delay before bringing suit is to be taken as strong evidence that he was not totally and permanently disabled before the policy lapsed."

Our task, then, is to ascertain, in the light of this admonition, whether there is substantial evidence of such disability. Appellee's allegations of disability, and the proof in support of them, will be summarized.

"Severe attack of gas from which he never recovered." He was gassed in the Argonne November 1st, on the fourth day of his active service. But it was mustard gas, and he was discharged from the hospital and restored to duty nine days later. If he was then totally disabled from mustard gas, he would not have been discharged from the Army Hospital and restored to duty. Upon discharge from the service seven months later, both he and his commanding officer certified that he no longer suffered, and was not disabled, from the burn. Mustard gas, while intensely painful and temporarily disabling, does not leave its scar on the organs of respiration as do the chlorine gases.

"That he suffered shell shock and became a nervous wreck on account of the rigors of battle." He was in battle four days; no trace of that nervous prostration known as shell shock showed up during the remaining eight months of his service. After his return home, occasionally he would jump up at night and dodge imaginary shells from phantom batteries. But such nightmares or night terrors are a part of the heritage from the shock of combat, and do not, fortunately, totally disable unless they result in a nervous exhaustion which winds up in psychopathic wards. And so of his restlessness upon return, the psychological result of a readjustment. Except for a handful of the most phlegmatic, returning soldiers from all the wars have experienced these phenomena; but time soothes the jumpy nerves, and their disabilities are not permanent.

"In France he became addicted to strong drink, resulting in chronic alcoholism." The proof: "He did not drink much but she saw him intoxicated about twice." "John liked whisky and would get tanked up once in a while."

"That at the time of his enlistment the said deceased was a potential dementia præcox subject, and that during the service of said decedent it became known that the said deceased was afflicted with syphilis, but it is not known as to whether same was acquired or inherited." There is no proof at all of dementia præcox; no proof of venereal disease during his service. Four years after discharge, a Wasserman Test shows a two-plus syphilitic infection. There is no proof that he acquired this disease while his policy was in force; nor that it was totally disabling, nor incurable.

There is evidence that he lost much weight—25 to 45 pounds—while in the service. But in November, 1923, he weighed 178 pounds and was 5 feet 10 inches tall. This is not emaciation. If he lost 45 pounds in the service, he was probably a bit overweight when he entered; many such reductions in flesh were accomplished in military service.

He was a good worker before he entered the Army, but was indisposed to physical effort afterward. It is not claimed, however, that he was not able to perform the duties of a convict while in prison. Such occupation is not "gainful," it is true, but that is because of the circumstances attendant upon its performance.

None of these facts, nor all of them together, lend any support for a finding of total or permanent disability. The finding of the learned trial court doubtless rested upon the testimony of Dr. Dorsey who testified that in his opinion he was totally disabled in 1922 and had been so for several years. If that opinion has any substantial basis, then there is support for the judgment; otherwise not.

Liability upon an insurance contract cannot be created by a doctor's opinion. The contract does not provide for payment if a doctor testifies that the insured is totally and permanently disabled. Doctors' opinions are of value in diagnosing ailments and in predicting the course they will run. Their value depends largely on the extent of the examination and the findings. Dr. Dorsey never saw Doublehead until October, 1922. His only examination was to talk with him through the bars of a cell. He made no physical examination at all; he could not make any mental examination except to talk with him and observe him. The sum total of his findings was that "he was kind of dull and it was hard to get any response from him; he would look around disinterested. * * * He had a very poor mentality * * * syphilis would explain his condition." There is no substance to such findings. Doublehead was a full-blood Cherokee, and his conduct is typical of the race, and discloses no abnormality. Upon the basis of this trifling examination and the facts heretofore narrated, the doctor's opinion rests. This opinion is without substantial basis and is of no value.

A report of an examination made in March, 1923, described Doublehead as a moron. If he was, he was a moron when he took out the insurance, and it was not a disability that was suffered while the insurance was in force.

We are of the opinion that the record discloses no substantial basis for a finding that

insured was totally and permanently disabled while his policy was in force. The judgment is therefore reversed.