## UNITED STATES v. TAYLOR.
### No. 4565.

Circuit Court of Appeals, Fourth Circuit.
March 11, 1940.

Young M. Smith, Atty., Department of Justice, of Washington, D. C. (Julius C. Martin, Director, Bureau of War Risk Litigation, of Washington, D. C., Wilbur C. Pickett, Sp. Asst. to Atty. Gen., and James O. Carr., U. S. Atty., of Wilmington, N. C., on the brief), for appellant.

J. V. Blackwell and D. G. Downing, both of Fayetteville, N. C. (H. C. Blackwell, of Fayetteville, N. C., on the brief), for appellee.

Before PARKER and DOBIE, Circuit Judges, and WEBB, District Judge.

DOBIE, Circuit Judge.

This is a civil action on a contract of War Risk Insurance. The court below denied the motion for a directed verdict in favor of the United States, and there was a jury verdict and judgment in favor of the plaintiff. For the determination of this Court, there is presented a single question: whether there was substantial evidence that on August 1, 1936, the plaintiff was totally and permanently disabled. We think there was, and that the verdict and judgment in the court below should not be disturbed.

Plaintiff, who had served in the military forces of the United States, had been adjudged to be totally and permanently disabled, and, on that basis, the payment of further premiums on the policy by the plaintiff was waived by the United States, and the plaintiff received from the United States monthly benefit payments from 1918 to 1936, when he was informed by the Veterans' Administration in Washington that he was no longer totally and permanently disabled and that the monthly benefit payments heretofore made to him upon that score would be discontinued as of August 1, 1936. The plaintiff's War Risk Insurance Policy, issued to him by the United States, provided that during plaintiff's total and permanent disability, all payment of premiums thereon by the plaintiff should be waived, and that, further, during said period of plaintiff's total and permanent disability the plaintiff should receive from the United States monthly payments at the rate of $57.50 per month. Accordingly, on August 17, 1937, plaintiff instituted this action against the United States to secure the payment of these disability benefits alleged to be due him from the United States under his contract of War Risk Insurance. Just why, or upon what evidence, the Government, after paying disability benefits to the plaintiff for a period covering nearly eighteen years, discontinued these payments, does not appear upon the record.

We believe that a brief survey of the evidence will disclose that there was ample evidence to justify the trial judge in submitting to the jury the question of the plaintiff's total and permanent disability on August 1, 1936, and to support the jury's determination of this issue in favor of the plaintiff.

Dr. Tiffany Barnes, a witness for the plaintiff, testified that when he first saw plaintiff, early in 1935, plaintiff was suffering from arthritis, amnesia, astigmatism and deafness. Certainly this is no trifling combination: two diseases, each affecting one of the most important means of sensory perception—deafness impairing the hearing and astigmatism distorting the vision; one mental affliction, amnesia, involving a form

of insanity; and one physical ailment that interfered with his ability to walk.

As to the arthritis (or rheumatism) so Dr. Barnes testified, "it was apparently a chronic condition"; there "was considerable swelling of the right hand and left knee"; "he [plaintiff Taylor] was not able to get around very much", and as to the effect of this disease on his ability to work, "he was completely incapacitated when I saw him in 1935". As to the plaintiff's amnesia, this same witness stated: "He has a brain lesion which causes his amnesia"; "his mental condition was such that he could not work"; "he would forget where he was, he might be on one job and forget it and go on to another." While, in answer to the question as to the curability of this amnesia, this doctor replied: "No sir, the prognosis is bad in those cases". This deafness, so said Dr. Barnes, amounted to "a roaring in his head and forty per cent loss of hearing". And, owing to the astigmatism (according to same authority) plaintiff's "eyes could not focus, he might be looking at an object and there would be two objects instead of one, and often there was a cross focus"; "just the moving of the ground as he walked along would give him headache". Further, this doctor stated as to the plaintiff: "He was just apparently progressively growing worse"; and in answer to the question, "How about his mental condition as you observed it just from talking with him?" the reply was: "Well, I think the man is in worse shape today than he was."

Two other doctors testified for the plaintiff. Dr. McFayden examined plaintiff two years before the trial and stated that plaintiff was then "mentally incompetent", and the doctor continued: "I have seen him from time to time since then and I do not believe there is very much change in his condition from time to time." Dr. McLeod examined plaintiff in 1936 and saw him again in 1937 and again in 1938. In 1936 this physician considered plaintiff "mentally unbalanced" and said: "I do not think he was capable of taking care of himself"; while he further found plaintiff "had what we call myocarditis, which is just a weak heart, and every little exercise he took it would run away with him". As to plaintiff's ability to work, Dr. McLeod observed: "With the combination of his bad heart, rheumatism and mental condition, I felt he was completely disabled." In connection with his observation of plaintiff at different times in 1936, 1937 and 1938,

this doctor stated: "His mental condition and his heart condition have been progressively growing worse"; he also ventured as to plaintiff's mental condition the gloomy prognosis: "I think it is going to get worse"; and he concluded a short cross examination by giving his opinion that plaintiff could not do any work of any kind, mental or physical.

The lay witnesses for plaintiff corroborate and strengthen the expert testimony of the doctors. Jesse Taylor, plaintiff's son, testified as to plaintiff's nervous condition, his insomnia, his mental delusions, his habit of wandering away from home for absences of several days, and, as to the period from 1934 to 1938, he emphatically stated: "I know of my own knowledge that he has done no work during this period because he wasn't able to, and he is not able to work at the present time." Plaintiff's second wife (whom he married April 11, 1935) also testified as to the serious mental and physical condition of plaintiff and stated: "He has never worked since I have known him." The testimony of the three other lay witnesses offered by the plaintiff (Mrs. Ella Taylor, his divorced wife, Sam Ross and B. C. Murphy) was in the main colorless and rather unimportant.

To offset the case thus made out by the plaintiff, the United States offered six lay witnesses, who testified, none too clearly and quite indefinitely as to the activities of plaintiff, and two doctors, one of whom was in the employ of the Government. The testimony of these witnesses is briefly reviewed.

One of the chief contentions of the United States was that the plaintiff could not have been totally and permanently disabled since at different times he had run a farm, managed a filling station, operated a grist mill, and in a light truck peddled peaches, watermelons and apples. To prove plaintiff's activities in these varied enterprises, the United States relied on the testimony of its six lay witnesses, Messrs. Graham, Adams, Parsons, Coble, Whatley and Parks. Even if their evidence is read in the light most favorable to the Government, the most that can be said is that though plaintiff was associated with these enterprises, his connections and activities therewith were at best irregular, fragmentary, uncertain and spasmodic. Thus the witness Graham stated: "Mostly the times I saw him out in the field he would be just standing around where the others were at work, or walking around." In like

manner said Parsons: "I noticed him stopping a good deal, but he was plowing." And so witness Adams declared: "He did not take hold of the work all the time but just was an overseer." Even more indefinite was the testimony of Coble, Whatley and Parks as to just how much plaintiff actually did in connection with the grist mill, the filling station and the fruit peddling business. On the other hand, the evidence of plaintiff's second wife and his son, which was altogether favorable to the contentions of plaintiff, was quite definite and precise as to the exceedingly slender activity of plaintiff in connection with all of these enterprises.

Dr. Moore's evidence as to his examination of plaintiff on April 16, 1936, related chiefly to the arthritis and myocarditis, which, Dr. Moore found, should not prevent plaintiff from engaging in a gainful occupation. While Dr. Moore made no special examination as to plaintiff's mental impairment, he stated in connection with the physical examination, that he observed in plaintiff not an abnormality but "a low grade mentality". Dr. Harry treated plaintiff in February, 1937, after he found plaintiff suffering from "spasm of the right ureter and gallbladder disease", and expressed an opinion that this trouble, which was "all that I found wrong with him", would respond to proper treatment; but this doctor said: "I did not attempt to make a nervous and mental examination of him", and expressed no opinion as to plaintiff's mental condition.

■ One other bit of evidence was brought out in the testimony of nearly all of the lay witnesses who had observed the plaintiff, and tends to corroborate the diagnosis of his mental trouble. It appears that not only did the boy, plaintiff's son, do the actual work, but also the boy almost invariably accompanied plaintiff anywhere he went to keep watch on him. The mental element in this case brings it within the pronouncement of Judge Parker in Garrison v. United States, 4 Cir., 62 F.2d 41, 42: "But in this case, there was the added element of psychoneurasthenia resulting from shell shock; and, if the testimony as to this is believed and taken in the light most favorable to plaintiff, his mental condition resulting therefrom was such as to render it impossible for him to pursue any substantially gainful occupation. Disability may result as well from the condition of the mind and nerves as from other causes."

Where a man is so inattentive or forgetful as a result of mental disorder that he cannot be trusted to carry on even simple forms of work, he is as truly disabled from earning a livelihood as one who must refrain from work on account of the condition of his vital organs. The case at bar in so far as it relates to disability arising from mental condition is almost 'on all fours' with United States v. Gower [10 Cir.], 50 F.2d 370, where the question as to total and permanent disability was held to be one for the jury." See, also, United States v. Scott, 6 Cir., 50 F.2d 773.

However, the question of total and permanent disability in the instant case did not rest solely upon plaintiff's mental disorders. It is evident, from a summary of the evidence of all the witnesses who testified, that there were also real physical ailments; and, furthermore, the cumulative effect of the nervous and organic troubles upon the plaintiff must be considered. We think that there was substantial evidence to justify the submission to the jury of the question of plaintiff's total and permanent disability, and evidence of sufficient strength and persuasiveness to warrant us in refusing to disturb the jury's finding that plaintiff was totally and permanently disabled on August 1, 1936.

In arriving at this conclusion, we have given due weight to other contentions made by the Government. Some of these perhaps deserve brief mention. Thus, surprise is expressed, in the light of testimony concerning plaintiff's mental condition, that he was "permitted to recover a judgment for a substantial sum of money without any apparent suggestion from court, counsel, relatives or friends of the appointment of a guardian for him". Our attention, too, is called to the fact that "plaintiff, although present at the trial, did not testify", and to the inferences (unfavorable to plaintiff) that this fact might warrant. See United States v. Fields, 8 Cir., 102 F.2d 535, 537, 538. We have considered the recent holding of this court in United States v. Marsh, 4 Cir., 107 F.2d 173, 174: "When the cause of the trouble is known, and is known to be frequently curable, permanency cannot be said to exist until reasonable effort to cure fails." (Opinion by Circuit Judge Parker.) The mere fact that he needed the help of his son in carrying on the business does not establish total and permanent disability. United States v. Haywood, 5 Cir., 73 F.2d 378. And the test for total disability is not whether plaintiff

did follow a substantially gainful occupation, but whether he was able to do so. Cockrell v. United States, 8 Cir., 74 F.2d 151. Mere conjecture and pure speculation are not bases on which total and permanent disability can be predicated. United States v. Anderson, 4 Cir., 76 F.2d 337. And finally, we have considered the weight that should be given to, and the limitations that must be imposed upon, the opinions of the doctors who examined the plaintiff. United States v. Doublehead, 10 Cir., 70 F. 2d 91, 92.

For the reasons stated, we affirm the judgment of the lower court.

Affirmed.