Karen BOHANNON *v.* WALMART STORES, INC.,
and Claims Management, Inc.

CA 07-862                                                   279 S.W.3d 502

Court of Appeals of Arkansas
Opinion delivered March 12, 2008

*Lundy & Davis, LLP*, by: *Jason M. Hatfield*, for appellant.

*Bassett Law Firm, LLP*, by: *Dale W. Brown*, for appellee.

KAREN R. BAKER, Judge. Appellant, Karen Bohannon, appeals from a decision by the Workers' Compensation Commission reversing the Administrative Law Judge (ALJ) and finding that she failed to meet her burden of proof that she was entitled to additional medical treatment. On appeal, she argues that the evidence was insufficient to support the Commission's decision, and therefore, it must be reversed. We agree and reverse and remand for an award of benefits.

It is undisputed that appellant sustained a compensable work-related injury on June 21, 2005. The testimony showed that on June 21, 2005, maintenance personnel were cleaning the air conditioning units on top of appellant's office building with a mixture of water and Kleencoil — a solution containing 2-butoxyethanol, sodium metasilicate, and isopropyl alcohol. The solution was placed into a hand sprayer and sprayed onto the evaporator coils of each air conditioning unit. The instructions for use of the chemical indicate that the units were to be turned off; however, the maintenance personnel did not turn off the units before spraying the chemical onto the coils. As a result, the chemical was dispensed through the air conditioning units into the office where appellant worked.

While sitting at her desk, appellant and two other co-workers began noticing a "chemical" smell emanating from an overhead air conditioner vent. Her two coworkers became ill, experiencing lightheadedness, dizziness, and headaches. Appellant noticed the odor, but continued working. Eventually, appellant

also became light-headed and got up from her workstation in an attempt to get some water and go to the breakroom. Appellant testified that she was having difficulty walking and had to lean on the wall for support. She then went outside, where the other employees were sitting, to get some fresh air. At this point, appellant was unable to speak coherently. An ambulance was called. When the ambulance arrived, the paramedics noted that appellant and one other coworker were unconscious. All three of the workers testified that they still suffered from chronic headaches and that the various medications they had taken were not successful in relieving their headache pain.

At the emergency room, appellant was described as suffering from chemical inhalation. The emergency room report indicated "Pt was working in her space and someone was cleaning ducts. . . . Pt awake but drowsy pt. trying to speak but words are garbled." A CT scan performed at the emergency room did not present any abnormalities, and a toxicological screen was also negative. Emergency room records indicated appellant was suffering from episodes of aphasia (a speech impediment, in this case, stuttering, and an inability to speak clearly). Dr. Shari DeSilva, a neurologist, stated in her report that appellant's "lightheadedness and diffuse 'weakness' (which may reflect unsteadiness), and dysarthria and headache following exposure to inhaled 2-Butoxyethanol, among other compounds, waxes and wanes. Her examination suggests cerebellar involvement."

Appellant was released from the emergency room that day; however, her symptoms persisted, and she saw Max Beasley, a nurse practitioner, the next day. Mr. Beasley noted that appellant was aphasic and had erythema (reddening) in her nasal passages. He called an ambulance to take her to the hospital. At the hospital, appellant had trouble speaking and was complaining of a headache and pain behind her left eye. She also had blurring of her left eye and swelling of her lips and mouth. A second CT scan of appellant's brain was taken, and the results were negative. On June 23, 2005, an MRI of the brain and a MRA of the "circle of Willis" were taken with the following impression: "1. Normal MRI of the brain. 2. Normal MRA of the circle of Willis." Dr. Howard opined in a Discharge Summary Report in June 24, 2005, that appellant had inhaled a chemical at work that was fairly innocuous and unlikely to have caused any neurological symptoms. He noted that appellant had been given medication and that her speech had

improved considerably. He released appellant and recommended a follow-up with her family physician, Dr. Bicak, in two weeks.

On July 5, 2005, appellant was taken to the emergency room after becoming unresponsive at work. The emergency-room report indicated that she "remains dysphasic" with "all utterances unintelligible." A CT scan, carotid ultrasound, and MRI of her brain were normal. Dr. David Ewart examined appellant and opined that appellant suffered from "intermittent expressive aphasia of uncertain etiology." He further stated, "One could consider the possibility of repeated chemical exposure. I am unaware of a chemical exposure that causes intermittent expressive aphasia. Another possibility would be conversion reaction." He recommended admitting Ms. Bohannan to Northwest Medical Center, placing her on Plavix, and obtaining an ultrasound of the carotids.

On July 9, 2005, Dr. Gary Moffitt examined appellant and determined that without additional testing, he was not sure "what [was] going on with Ms. Bohannon." His report indicated that he was unsure whether appellant had a complex migraine or if the chemical had anything to do with her symptoms. Therefore, he opined that "more work need[ed] to be done." Because of the nature of appellant's job and her health condition, he determined that she should be off work.

Dr. Reginald Rutherford, a neurologist, also examined appellant on July 26, 2005. Based on a review of her symptoms, Dr. Rutherford concluded that it was likely that her problems were unrelated to her migraine headaches or to an acute psychosis; a more probable explanation was considered to reside within the diagnosis of conversion reaction. In order to help with a diagnosis, Dr. Rutherford recommended that she undergo a SPECT scan of her brain to evaluate brain function rather than brain structure. The scan was performed on August 12, 2005. In his report, Dr. Rutherford stated:

> Her SPECT scan raises the possibility of an abnormality or lesion left hemisphere. This was discussed with the radiologist. This may also represent artifact. To clarify whether or not there is evidence of a structural abnormality left hemisphere not disclosed on prior MRI imaging of the brain arrangements will be made for a current MRI study of the brain. This is to be correlated with the SPECT scan and will be performed at St. Vincent's Infirmary. Ms. Bohannon will be seen in follow up once this is completed.

Dr. Moffitt noted that he agreed with Dr. Rutherford's recommendations for a SPECT scan; however, because appellee controverted the treatment, the comparison MRI of the brain was not performed.

Dr. Moffitt saw appellant for a follow-up examination on September 13, 2005. On that day, he noted that although appellant still suffered from headaches, her condition had improved. He also noted that her speech had improved. He released her to return to full-duty work with no return appointment and no permanent impairment.

On October 11, 2005, appellant was seen for her complaint of slurring speech. It was noted that she had been exposed to a chemical at work. However, a CT scan of her head showed no abnormalities. Dr. Ehrhart noted that appellant's tests were normal and assessed her with dysarthria (slurred speech), hypertension, and diabetes. Dr. Ehrhart wanted appellant to continue taking aspirin, start propranolol for migraine prophylaxis, and see a speech therapist. Dr. Ehrhart noted also that conversion reaction was also a possibility.

Dr. Michael Morris, also a neurologist, examined appellant in December 2005. In his report dated December 5, 2005, he noted her hesitancy in speech and "some slowness in following commands such as finger tapping and arm roll." He concluded that appellant had "neurologic symptoms related to a possible exposure at work," and he wanted to review all of her medical records.

Appellant again sought emergency treatment on December 12, 2005. She was examined by her family physician, Dr. Bicak, who diagnosed her with a headache with dysarthria, hypertension, and diabetes. Dr. DeSilva also examined appellant again on December 12, 2005. She concluded that appellant suffered from vertebrobasilar migraine headaches with some psychogenic overlay and needed an "overnight pulse oximetry as a screen for sleep apnea and . . . a trial of 100% O2 by rebreathing mask for 20 minutes. This is often helpful in breaking migraine status."

Dr. Howell Foster, Director of the Arkansas Poison Control Center, testified generally as to exposure to 2-butoxyethanol. While not a medical doctor, Dr. Foster has an undergraduate degree in pharmacy and is a doctor of pharmacy. Dr. Foster testified that in his professional opinion, 2-butoxyethanol was not the cause of appellant's headaches and speech problems. At the "heart" of that opinion was the fact that appellant did not have eye, nose, and skin irritations in conjunction with her headaches.

He further based this opinion on his belief that appellant was not exposed to a level of 2-butoxyethanol significant enough to lead to her current symptoms. When questioned further in the deposition about the basis for his opinion, Dr. Foster admitted that he was unaware of the dimensions of the room where appellant worked; did not know the number of vents in the room; did not know how much 2-butoxyethanol was put in the air conditioner unit; did not know how much of the chemical was blown into the room; and did not know how close appellant was sitting to a vent. Moreover, in his deposition he stated that he did not know how long appellant was exposed to the chemical before becoming ill and admitted that the length of her exposure was "not described anywhere." He also stated in his deposition that it was his understanding that her exposure was only "a few minutes."

A prehearing order was filed on March 16, 2006, and appellant claimed that she was entitled to additional medical treatment based upon multiple recommendations by her doctors. On August 7, 2006, the ALJ found that appellant was entitled to additional medical treatment; that Dr. Morse would be the treating physician for future medical treatment; and that appellee was responsible for unpaid medical benefits provided in connection with appellant's compensable injury. Appellees filed a notice of appeal for review by the Commission. On June 28, 2007, the Commission issued an opinion reversing the ALJ's finding that appellant was entitled to additional medical treatment. The Commission's opinion explained that appellant failed to prove the following: that she was entitled to additional medical treatment from Dr. Rutherford and Dr. Morse; that she was entitled to a psychological evaluation at the appellees' expense; that additional treatment and/or referrals from Dr. Rutherford or Dr. Morse were reasonably necessary in connection with the compensable inhalation injury; that treatment for sleep apnea and migraines recommended by Dr. DeSilva was reasonably necessary in connection with the compensable inhalation injury; and that continued medications for headaches were reasonably necessary in connection with the compensable inhalation injury. This appeal followed.

When reviewing a decision of the Commission, we view the evidence and all reasonable inferences deducible therefrom in the light most favorable to the findings of the Commission and affirm that decision if it is supported by substantial evidence. *Liaromatis v. Baxter County Reg'l Hosp.*, 95 Ark. App. 296, 236 S.W.3d 524 (2006) (citing *Clark v. Peabody Testing Serv.*, 265 Ark. 489, 579

S.W.2d 360 (1979); *Crossett Sch. Dist. v. Gourley*, 50 Ark. App. 1, 899 S.W.2d 482 (1995)). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Wright v. ABC Air, Inc.*, 44 Ark. App. 5, 864 S.W.2d 871 (1993). The issue is not whether we might have reached a different result or whether the evidence would have supported a contrary finding; even if a preponderance of the evidence might indicate a contrary result, if reasonable minds could reach the Commission's conclusion, we must affirm its decision. *St. Vincent Infirmary Med. Ctr. v. Brown*, 53 Ark. App. 30, 917 S.W.2d 550 (1996). The Commission is required to weigh the evidence impartially without giving the benefit of the doubt to any party. *Keller v. L.A. Darling Fixtures*, 40 Ark. App. 94, 845 S.W.2d 15 (1992).

Our workers' compensation law provides that an employer shall provide the medical services that are reasonably necessary in connection with the injury received by the employee. Ark. Code Ann. § 11-9-508(a) (Supp. 2007); *Fayetteville Sch. Dist. v. Kunzelman*, 93 Ark. App. 160, 217 S.W.3d 149 (2005). The employee has the burden of proving by a preponderance of the evidence that medical treatment is reasonable and necessary. *Kunzelman, supra.* What constitutes reasonably necessary medical treatment is a question to be determined by the Commission. *White Consolidated Indus. v. Galloway*, 74 Ark. App. 13, 45 S.W.3d 396 (2001) (citing *Gansky v. Hi Tech Eng'g*, 325 Ark. 163, 924 S.W.2d 790 (1996)).

The sole issue before this court is whether the Commission erred in determining that additional medical treatment, including but not limited to Dr. Rutherford's recommendations, was not necessary. We hold that the Commission erred.

First, the Commission relied heavily on Dr. Foster's expert opinion, and it is clear from the record that Dr. Foster's opinion was based on several erroneous assumptions. Specifically, Dr. Foster admitted that he was unaware of the dimensions of the room where appellant worked; did not know the number of vents in the room; did not know how much 2-butoxyethanol was put in the air conditioner unit; did not know how much of the chemical was blown into the room; and did not know how close appellant was sitting to a vent. Moreover, he was unaware of the length of her exposure. He assumed that appellant's exposure time to the chemical was only a few minutes. However, appellant's co-workers testified that they left the work area thirty minutes after noticing the chemical odor, but appellant did not accompany them

at that time. Rather, she remained behind at her workstation. Therefore, contrary to Dr. Foster's assumption, appellant's exposure was greater than thirty minutes.

Dr. Foster also made it clear during his deposition that the key factor in his opinion that appellant's headaches and speech problems were not caused by 2-butoxyethanol was that appellant did not experience any eye, nose, and skin irritation in conjunction with her headaches. Dr. Foster agreed that those findings were at the "heart" of his opinion. Contrary to Dr. Foster's opinion, the emergency-room reports revealed that immediately following her exposure, appellant experienced pain and blurry vision in her left eye, had redness in her nasal chambers, and appeared to have swelling in her lips and mouth.

As a general rule, the appellate courts defer to the Commission on issues involving the weight of the evidence and the credibility of witnesses. *See Freeman v. Con-Agra Frozen Foods*, 344 Ark. 296, 40 S.W.3d 760 (2001). Furthermore, it is well settled that the Commission has the authority to determine its medical soundness and probative force. *Williams v. Brown Sheet Metal*, 81 Ark. App. 459, 105 S.W.3d 382 (2003). The Commission has a duty to use its experience and expertise in translating the testimony of medical experts into findings of fact. *Id.* However, these standards must not totally insulate the Commission from judicial review because this would render this court's function meaningless in workers' compensation cases. *Hill v. Baptist Med. Ctr.*, 74 Ark. App. 250, 57 S.W.3d 735 (2001).

In *McDonald v. Batesville Poultry Equipment*, 90 Ark. App. 435, 445-46, 206 S.W.3d 908, 916 (2005), this court held that:

> We hold that no substantial evidence supports the Commission's conclusion that McDonald is not permanently and totally disabled. The Commission relied in significant part on Naylor's assessment that jobs were available to McDonald. Naylor testified, however, that her assessment of available jobs was produced before the psychological and psychiatric reports were made, and she testified that she had not considered them prior to forming her opinion. Additionally, the Commission ignored these psychological and psychiatric reports, which corroborated McDonald's testimony that he is functionally illiterate and which clearly assessed further limitations on his ability to perform work. We hold that reasonable minds could not come to the conclusion that McDonald is not totally and permanently disabled.

Also, in *Easton v. H. Boker & Co.*, 226 Ark. 687, 691, 292 S.W.2d 257, 260 (1956), citing the Eighth Circuit case of *United States v. Thornburgh*, 111 F.2d 278, 280 (8th Cir. 1940), our supreme court stated:

> In the case of *United States v. Thornburgh*, 111 F.2d 278, 280, Judge Sanborn, speaking for the Eighth Circuit Court of Appeals, used this language, which we find apropos here:
>
> > A reviewing court, however, is not always required to accept as substantial evidence the opinions of experts. 'Where it clearly appears that an expert's opinion is opposed to physical facts or to common knowledge or to the dictates of common sense or is pure speculation, such an opinion will not be regarded as substantial evidence.' *Svenson v. Mutual Life Ins. Co. of New York*, 8 Cir., 87 F.2d 441, 445. *See also United States v. Hill*, 8 Cir., 62 F.2d 1022, 1025; *United States v. Doublehead*, 10 Cir., 70 F.2d 91, 92.

Moreover, in *O.K. Processing, Inc. v. Servold*, 265 Ark. 352, 358, 578 S.W.2d 224, 228 (1979) (citing *Easton, supra*), our supreme court stated that "[t]he opinion of an expert will be considered to be substantial evidence unless it clearly appears that the expert's opinion is opposed to physical facts or to common knowledge or to the dictates of common sense, or is pure speculation."

■ In this case, when we view the evidence in a light most favorable to the Commission, we cannot say that, when confronted with the same evidence, reasonable minds could reach the same conclusion as the Commission. Dr. Foster's opinion, upon which the Commission heavily relied, was based upon inaccurate assumptions and speculation. Moreover, at the "heart" of Dr. Foster's opinion was the assumption that appellant did not suffer from the symptoms that would normally accompany chemical inhalation. Yet the medical reports reveal that she did in fact suffer from such symptoms; therefore, Dr. Foster's opinion was based upon factual errors.

Additionally, Dr. Rutherford recommended a SPECT scan, which showed the possibility of an abnormality or lesion in the left hemisphere. Due to that finding, Dr. Rutherford recommended a current MRI of appellant's brain with which to compare the SPECT scan results. However, because appellee refused to pay for

the MRI, it was never done. In *Gansky v. Hi-Tech Engineering*, 325 Ark. 163, 169, 924 S.W.2d 790, 794 (1996) our supreme court held that:

> Under these circumstances when the treating neurosurgeon has prescribed a functional capacity assessment and that was not done because Hi-Tech would not pay for it, we cannot agree with the Commission that additional medical treatment was not reasonably necessary or that the healing period had ended. We conclude that fair-minded persons, viewing the same evidence, could not decide otherwise.

We are confronted in this case with the same situation our supreme court addressed in *Gansky, supra,* and likewise we hold that substantial evidence does not support the Commission's decision denying appellant additional medical treatment. Accordingly, we reverse and remand for an award of benefits.

Reversed and remanded.

GRIFFEN and VAUGHT, JJ., agree.